Opinion issued August 30, 2012



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00436-CV

———————————

**ANNA MICHELLE O'BRIEN, Appellant**

**V.**

**DANIEL L. DABOVAL, INDIVIDUALLY AND AS A MEMBER OF THE FIRM OF DABOVAL & O'BRIEN, P.L.L.C AND WENDY DABOVAL,** Appellees

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2006-63969

# O P I N I O N

Appellant, Anna Michelle O'Brien ("Shelly"), challenges the trial court's judgment, entered after a bench trial, in favor of appellees, Daniel L. Daboval ("Dan"), individually and as a member of the firm of Daboval & O'Brien, P.L.L.C. ("D&O"), and Wendy Daboval ("Wendy"), in the Dabovals' suit against Shelly for fraud. In five issues, Shelly contends that the trial court's judgment does not conform to the trial court's findings of fact, any statements made by Shelly to the Dabovals were "mere expressions of opinion" and are "not actionable," the Dabovals presented no evidence that they relied or justifiably relied upon any statement made by Shelly, the evidence "conclusively established" that Dan was "responsible for nearly all the damages" incurred by the Dabovals, Dan "failed to meet his burden of proving the actual amount of alleged loss," and, alternatively, the case should be remanded for a new trial if there is evidence of "some damages."

We affirm.

## Background

In their second amended petition, the Dabovals alleged that, in late 2002, J.R. O'Brien ("J.R."), who was Shelly's husband, decided to leave his former law firm, Bush & O'Brien P.L.L.C. ("BOPC"), to join a firm being created by Dan, D&O. The Dabovals further alleged that J.R. and Shelly, who was "involved in J.R.'s practice" and later worked as a bookkeeper for D&O, failed to disclose that

2

the O'Briens' personal finances were in "dire straits," J.R.'s practice was "failing," and J.R. owed BOPC outstanding amounts. The Dabovals asserted that the O'Briens made affirmative misrepresentations to them regarding the status of J.R.'s practice and the O'Briens' financial situation. The Dabovals claimed that Dan was fraudulently induced to enter into a partnership with J.R., establish a "line of credit," fund a firm account from which the O'Briens took "excessive draws," and post a personal bank account as collateral. The Dabovals sought damages totaling $273,688, including $157,847 for J.R.'s negative capital account with D&O and $101,175 for the loss of a personal bank account. After J.R. and Shelly divorced and J.R. filed for bankruptcy, the Dabovals dismissed their claims against J.R. and presented their fraud claims against Shelly.

At trial, Dan testified that in late 2002, he had decided to start his own firm and, during a dinner conversation with his wife and the O'Briens, he learned that J.R. was looking to leave BOPC to "do better on his own." After agreeing to form the D&O firm, Shelly handled "a lot of stuff" in D&O's "startup," including filing papers, obtaining tax identification numbers, and looking for office space to lease. Dan opened up D&O's operating bank account, furnishing $25,000 in November 2002 and another $35,000 at a later time. The O'Briens subsequently informed Dan that they could not contribute cash capital as they "needed to wait for the money to come in" from BOPC "and for the cases to start rolling in." However,

3

the O'Briens assured Dan that "they were expecting about $30,000 to $50,000" from BOPC.

In regard to Shelly's participation in these discussions, Dan explained that Shelly "talked about [BOPC] and what J.R. was doing there and what he had there." "[F]rom the very first meeting," Shelly commented "what a great book of business and things that J.R. had there." Additionally, both J.R. and Shelly had "talked about Allstate" as a "primary client" of J.R.'s, and they indicated that J.R. was "building a plaintiff's practice." Dan noted that, "in terms of finances," Shelly was "very, very knowledgeable" and it was "clear right from the get go that if you wanted to talk anything financially with J.R," then you spoke with Shelly. Shelly was "very intimately involved" with "finances," she was "part of the discussions" about the "expectation" of the money that the O'Briens were to receive from BOPC, and she "had a hand in preparing" a financial statement concerning the O'Briens' finances that J.R. submitted to Dan.

Dan further testified that his original agreement with J.R. was for him and J.R. to both capitalize the firm with cash contributions, retain their profits, and share expenses. However, at some point in December 2002, the O'Briens told Dan that they "couldn't put up the cash," and they asked Dan to help them obtain a "line of credit" and "meet with the bank" for approval. Prior to the bank meeting,

4

the O'Briens provided Dan with their financial statement.[1]  Dan explained that, being "most concerned" with the O'Briens' "financial condition and wherewithal to pay back . . . any line of credit or cover their expenses," he was interested in confirming their assets, liabilities, and debt levels.  The financial statement, which was signed by J.R. and dated December 6, 2002, showed that the O'Briens had no "contingent liabilities," "income tax claim or dispute[s]," partnership-related debt, or credit-card debt.  And it showed that the O'Briens possessed a "net cash flow" of $46,850.  Dan commented to the O'Briens that he was "impressed" with the fact that they did not have any credit-card debt.  The financial statement also contained the following recital: "The income listed was income earned as a shareholder of [BOPC].  As shown by the materials previously provided, I project this income to be higher. . . .  Additionally, upon resignation from [BOPC], I anticipate I will receive compensation for my shareholder interest of $25,000 to $50,000, depending on various factors."  The information disclosed by the O'Briens in the written financial statement, which was filed with the bank on December 10, 2002, was consistent with the O'Briens' oral representations.  Dan agreed that Shelly was not present for the meeting with the bank to obtain the line of credit.

Dan explained that the line of credit was obtained to "cover" D&O's and the O'Briens' expenses, including for "financ[ing] cases" and covering the O'Briens'

---

[1]     Although Dan first stated that either Shelly or J.R. had provided him with the financial statement, he also testified that he received a "copy from them."

"living expenses that they needed." Dan agreed that the O'Briens could withdraw $10,000 monthly for living expenses, with the expectation that "at some point in time" the draws would no longer be necessary because J.R. would "catch up." Dan stated that Shelly, who had previously worked as a project engineer and performed "cost accounting work" in that capacity, was given the authority to draw on the line of credit without his authorization because she handled D&O's bookkeeping and she had "set up all the finances for the firm and the financial stuff." Business records introduced into evidence show that in December 2002 and January 2003, D&O bank account checks were made out to J.R. Also introduced into evidence were communications between Shelly and the bank in which Shelly requested draws on the line of credit. Dan explained that he trusted the O'Briens "completely" as "friends" and "partners."

The Dabovals also introduced into evidence a copy of an original petition that had been filed by Bush, J.R.'s former law partner, against J.R. in May 2003 (the "BOPC lawsuit"). The petition reflects that there had been financial disputes between Bush and J.R. regarding J.R.'s practice at BOPC. Attached to the petition is a document, signed by J.R. on December 18, 2002, pertaining to the settling of disputes between J.R. and Bush. The document, entitled "Release of All Claims," states that J.R. "guarantee[d] the collection" of certain outstanding accounts receivables," identified on an attached exhibit, totaling $87,865. The exhibit

6

reflects that these guaranteed receivables were "aging": 47% of the receivables were "120 days out," 1% were "90 days out," and 13% were "60 days out." The release further provides that any of these guaranteed amounts "not collected within six months" would be paid in full by J.R. Although the release recites that J.R. was assigned certain unbilled fees and expenses, it required that J.R pay BOPC $24,000 incrementally, at $3,000 a month. Dan noted that at no point during December 2002, which was about the same time that he had formed and capitalized D&O and the O'Briens had furnished the financial statement to him, did J.R. or Shelly inform him that "things [had] changed" with BOPC or J.R. had guaranteed accounts receivables to BOPC and had agreed to pay an outstanding debt to BOPC. Dan noted that he would have been "concern[ed]" and "inquired further" had he known about this release agreement from the BOPC lawsuit and the age of the guaranteed receivables.

Dan explained that, in obtaining the letter of credit, he had relied upon what the O'Briens had told him about waiting on the "collections in [J.R.'s] cases" to "start[] paying off." Although Dan agreed that there were no "particular" discussions about the O'Briens' "personal financial situation" at the time D&O was formed, he noted that the O'Briens never told him that "they were broke," but rather, "by all appearances," they "looked like they were . . . doing okay" and their financial statement reflected "healthy" finances.

7

Dan further testified that Shelly assumed the role of D&O's bookkeeper immediately, she handled the accounting system, and she met with the firm's accountants. Until Shelly left D&O in 2004, Dan looked to her to obtain financial reports on the financial condition of D&O. Dan noted that in the first six months of 2003, he was extremely busy, was out of the office trying cases, did not have time to check D&O's books and records, and completely relied upon Shelly for the "financial stuff." Sometime in 2003, Dan learned that J.R. had "lost most of the Allstate [business], or all of it," and he and J.R. agreed to "change the compensation agreement" so that they would "split the [firm's] profits 50/50" and Shelly would "start getting a paycheck." In July 2003, Dan sent an e-mail to Shelly to inform her that he and J.R. had agreed that, going forward, one partner would be required to sign any checks made out to the other partner. In this e-mail, Dan also asked Shelly whether J.R. had been taking draws on D&O's account. At this same time, a D&O associate notified Dan that J.R. was "billing all this money" but "not collecting it very quickly." Up to this point, Dan had not been paying attention to whether the O'Briens were taking draws, and he had not been totaling any draws. In response to his e-mail inquiry, Shelly told Dan that the O'Briens had been taking the $10,000 monthly draw. However, other evidence indicated that the O'Briens had taken draws in excess of this amount. Dan noted that the

8

O'Briens had never informed him that they needed to take a monthly draw exceeding $10,000 and, had he known, he would have made further inquiry.

In August 2003, Dan and Shelly engaged in e-mail communications in which Dan noted that D&O was "in a hole" regarding its "firm expense ratio." Dan explained that he had been noticing that D&O was "out of whack," and he was becoming concerned. Although J.R. was copied on these communications, Shelly continued "handling the accounting and the finances and stuff." Dan was concerned that the O'Briens were taking "more out than [they] were entitled to in profits," and he asked Shelly to check with the firm's accountant. Shelly responded that she had spoken with D&O's accountant, and he told her that if the O'Briens were "under water" at year's end, the discrepancy would be "classified as a loan" and they would then "execute loan documents and notes to the firm." Dan, noting that the O'Briens had always understood that they had a joint obligation and responsibility, allowed them to continue making draws. And the Dabovals introduced into evidence tax documents reflecting J.R.'s negative capital account with D&O. Dan also noted that he continued to leave his share of profits in D&O's bank account.

Dan, who remained busy trying cases, agreed that, at this time, he still had not consulted "the source documents" or "the firm book and records" to do his own analysis. He continued to rely upon Shelly for this information. And, although

9

J.R. continued to take draws on D&O's account, Dan did not object to the draws. Dan continued to believe the O'Briens' promises that they would "get even this year," and he considered the financial relationship with the O'Briens as "pretty much" a "bridge loan." In February 2004, Shelly told Dan that she was leaving her position with D&O to "work full time to help get even." The O'Briens also continued to tell Dan that J.R.'s former partner Bush "owed them" money, and they claimed that they had sued Bush for J.R.'s partnership share.

In May 2004, Dan decided to stop practicing law effective June 2004, and Dan and J.R. agreed to terms so that J.R. would continue D&O. J.R. represented that he would handle renewing the line of credit, on which J.R. only had to pay the interest. Dan agreed to leave his money in the D&O account until the end of 2004 so that J.R. would have operating capital. In September 2004, Dan received a letter from the firm's bank, informing him that the line of credit was in default. The bank sued Dan, and when he contacted J.R., J.R. agreed to address the situation, but he did not. Upon learning that the bank was going to take a default judgment, Dan entered into an agreement with the bank to post as collateral a personal bank account, which totaled approximately $102,000. The O'Briens told Dan that they would "substitute that collateral out by something" or get a loan from a family member.

In May 2005, Dan, who was no longer actively practicing law, learned from another D&O employee that, among other things, D&O was not paying its vendors and was in financial distress. Dan still remained on the line of credit because the O'Briens had not fulfilled their agreement to substitute collateral. D&O was ultimately wound up through judicial proceedings instituted by Dan. Dan stated that he would not have set up the line of credit "had [he] known any of that stuff" and would "not have allowed [the O'Briens] to have draws if there wasn't profits."

Andrew Rossi, a certified public accountant, testified that he had been hired to prepare the partnership tax records for D&O, finalize the accounting for years 2004 to 2006, and close out the financial records and books of D&O so that it could be wound up. Rossi calculated J.R.'s capital account for the years 2002 through 2006, which he explained accounted for the individual partner's balance of their distributions, contributions, and proportionate share of income and expenses. He noted that J.R.'s capital account at the end of 2006 equaled a negative $171,207 balance. Rossi explained that this meant that J.R. owed this amount of money to D&O. He further noted that, in addition to this amount, J.R. also owed "a $5,500 withdrawal distribution back from 2002" and a "$8,500 collection of law firm invoices" that J.R. "cashed in his personal account." Thus, J.R. owed to D&O a total of $185,207, which Rossi contended was "conservative." Rossi broke down

11

his figures for the court, and he explained that J.R.'s negative balance with D&O at the end of 2004 was $152,347 and, at the end of 2005, a negative $158,513.

J.R. testified that he did not have any reason to disagree with the assertion that the financial statement was a form "put together" by him and Shelly. He conceded that from December 2002 through January 2003, money for him and Shelly was "tight." J.R. also acknowledged that his family had credit accounts with American Express, Visa, and "maybe" a MasterCard, although he did not believe that these accounts were "maxed out." He also agreed that he had "discussed things" with Shelly regarding the BOPC release agreement and Shelly knew about his meeting with Bush to settle the dispute with BOPC. J.R., because he is "numerically challenged," had Shelly help him by looking at accounts receivables and compensation formulas so that he could discuss "actual numbers." Specifically, in regard to Shelly's involvement in the dispute and settlement with Bush, the following exchange took place,

> [Counsel]: But you don't recall if she got heavily involved in crunching numbers to assist you in your negotiations with Mr. Bush?
>
> [J.R.]: Before this release of claims was filed, yes, she did help in looking at the CCAs as compensation formulas—and what I have outstanding would have been accounts receivable—and helping—I'm numerically challenged, I guess is a way to put it.
>
> . . . .

12

[Counsel]: So she assisted you in taking a look at those documents that would have allowed you to meet with Mr. Bush to discuss the actual numbers. Is that a –

[J.R.]: Yes.

J.R. further agreed that, in the release, he had guaranteed Bush the collection of $87,865.17 and, as a result, he was personally liable for these collections. He also agreed that he was obligated to pay Bush $24,000, in $3,000 monthly installments, for his "negative balance" or "overdrawn deposit account." J.R. acknowledged that he had made one payment of $3,000 for his debt to BOPC by using funds obtained from D&O's bank account because he did not personally have the money to make the payment.

Shelly testified that money was "tight" for the O'Briens in 2003 and they were "bouncing" checks in December 2002 before they were able to obtain funds from the D&O account. She agreed that she had seen the books of BOPC prior to J.R.'s meeting with Bush, and she acknowledged that, at some point before writing a $3,000 check to Bush in January 2003, she became aware of the $3,000 monthly obligation that J.R. had agreed to pay Bush. Moreover, the BOPC release reflected that the $24,000 obligation owed by J.R. related to her "use of the Bush firm credit card" on which she had purchased "various and sundry things." Shelly explained that she had used the BOPC credit card at J.R.'s instruction, and she had "anticipated" that this would "even out" when J.R. left BOPC. Although she

13

presented conflicting testimony on this matter, Shelly, at one point in her testimony, conceded that she knew as of January 2003 that "there was no money coming in from" Bush. She noted that in the first six months of 2003, the O'Briens took $87,000 from D&O's bank account, but she explained that J.R., who was practicing law at the time, had, by her calculations, $115,000 "coming in from his clients."

Although Shelly agreed that one of the purposes for the line of credit was so that the O'Briens could take a draw, J.R., at the time the line of credit was established, "thought he was going to receive a check from [BOPC] for around 40 to $50,000." Shelly conceded that she had never told Dan that the O'Briens needed to withdraw more than $10,000 a month from the D&O account. And she was aware that a judgment had been entered against J.R. in the BOPC lawsuit. Nevertheless, she did not disclose this fact to Dan. She acknowledged that Dan had relied upon her to be truthful and to provide full disclosure if she knew that "something going on with the firm's account wasn't right." Shelly also admitted that, while working for D&O, she was involved in financial reporting, writing checks, and drawing on the line of credit.

Shelly's testimony and other documentary evidence reveals that the O'Briens had significant credit-card debt and outstanding taxes that were not disclosed to Dan. Although Dan had furnished funds and was liable on the line of

14

credit, Shelly stated that it "never crossed [her] mind" that, as of August 2003, she would have any personal "obligation with respect to the money." Rather, it was her understanding that "money was going to come from the business that was generated" by D&O. On August 27, 2003, in response to Dan's e-mail inquiry about his concerns that D&O's profits were not covering the amounts being withdrawn by the O'Briens, Shelly did tell him that, if at the end of the year "[t]he draw exceeds the profits," then "we will classify it as a loan" and "we will have a document showing when repayment is expected." However, Shelly denied that, by using the word "we," she was referring to herself or J.R. And she did not believe that she and J.R. had any personal obligation regarding the funds that she and J.R. had withdrawn from D&O's bank account.

Wendy testified that during the couples' first conversation about the formation of D&O, Shelly described J.R.'s book of business as "substantial and healthy and that it was certainly enough for them to bring to the firm and live on." Wendy also participated in discussions with Dan and Shelly when the bank was threatening to seize the Dabovals' bank account, which the Dabovals had posted as collateral for the line of credit. Wendy explained that Shelly had promised to repay the debt by refinancing their home and signing a promissory note. Also, Shelly represented that the O'Briens intended to repay any amounts placed at risk by the Dabovals.

15

In its final judgment, the trial court found that Shelly "committed common-law fraud by making false representations and failing to disclose material information." The trial court awarded the Dabovals damages in the amount of $157,847. In its findings of fact and conclusions of law, the trial court found that,

5.  Prior to his partnership with [Dan], [J.R.] practiced law with the firm of [BOPC]. . . . [J.R.] and his former partner entered an agreement setting out the terms of their "formal business divorce" . . . [in a release]. . . dated December 18, 2002.

6.  Pursuant to the Release, [J.R.] guaranteed collection of $87,865.17, representing past due accounts payable, and agreed to repay $24,000[.]

7.  A lawsuit for breach of the agreement regarding BOPC was filed a few months later against [J.R.] and [Shelly] intervened . . . .

8.  At about the same time that [J.R.] was negotiating his agreement regarding BOPC, [J.R.] and [Shelly] were discussing with the Dabovals forming a new law firm, [D&O].

9.  [Shelly] represented that they would be receiving several thousand dollars as part of the windup of BOPC . . . [and] her husband had a thriving practice with established clients.

10. Initially, the plan was for each partner to make a capital contribution into [D&O]. [J.R.] and [Shelly] each explained that they were not able to make a capital contribution at this time but would have the funds as soon as the BOPC windup was completed.

11. To carry [J.R.] and [Shelly] until the BOPC windup was completed and his practice was self-sufficient, [Dan] agreed to establish a line of credit for [D&O]. As part of establishing the line of credit, [J.R.] was required to submit a Financial Statement to [the Bank]. . . . [J.R.] signed the Financial

16

Statement; [Shelly] did not. A copy of the Financial Statement signed December 6, 2002, was given to the Dabovals.

12. The December 6, 2002 Financial Statement showed a positive cash flow, no credit card debt, and no liabilities other than a mortgage. Further, it stated, "I anticipate I will receive compensation for my shareholder interest [from BOPC] of $25,000–$50,000 depending upon various factors." . . . .

13. [J.R.] testified that he is "numerically challenged." [Shelly] handled the family finances and was familiar with the status of her husband's collection efforts . . . . The preponderance of the evidence indicates that she was at least aware of the contents of the Financial Statement if, in fact, she did not prepare it.

14. The statements [Shelly] made to the Dabovals were false. [J.R.'s] practice was failing, his primary client was about to fire him, and many of his bills were over 120 days past due. It was highly unlikely that his practice would be self-sufficient in just a few months. The family finances were at a critical point with several credit cards at their limit. Moreover, [Shelly] was aware that instead of receiving money from BOPC, there would be a substantial liability owed to BOPC.

15. [Shelly] knew the representations were false at the time she made them.

16. [Shelly] knew that the Dabovals were not aware of [J.R.'s] obligations to BOPC, the true status of his practice, and the inaccuracies in the Financial Statement and failed to disclose them.

17. [Shelly] intended for the Dabovals to rely upon her representations and the Financial Statement. Specifically, she intended to induce [Dan] into forming a partnership with her husband and capitalizing it with a line of credit that she could use to payoff other obligations. She feared that if she disclosed her family's true financial condition, and the actual state of [J.R.'s] law practice, then [Dan] would not form [D&O], or at a

17

minimum would restrict her and [J.R.'s] ability to withdraw money from [D&O].

18. As a further inducement to [Dan] to secure a line of credit, [J.R.] agreed to limit [J.R.'s] draws to $10,000 per month, pretax, until he was generating more than that amount plus his share of expenses. [Shelly] was aware of the amount of draws to which her husband was entitled.

19. Based on the Financial Statement given to the Bank and their knowledge of the O'Briens' lifestyle, the Dabovals' reliance on her statements was reasonable and justified. The Dabovals did not know that the representations were false.

20. Had [Dan] known the truth, he would not have formed [D&O], would not have capitalized it with his and his wife's money, and would not have secured the line of credit for the benefit of [J.R.] and [Shelly].

21. [Dan's] primary motivation in securing the line of credit was to provide funds for [J.R.] and [Shelly] to draw upon in the time it took for [J.R.'s] practice to become self-sufficient and for the wind up of BOPC to be completed.

22. In December 2002, [J.R.] and [Dan] formed [D&O]. [D&O] was organized . . . [so] that each partner would have to collect enough to cover his share of expenses and then would receive the remaining percentage of his collections.

23. [Shelly] was involved in the formation of [D&O]. She was a volunteer employee at [D&O] from its inception and later a paid employee. [Shelly] served as [D&O's] bookkeeper from its inception through the spring of 2004, when she left.

24. Immediately after formation of [D&O], [J.R.] began withdrawing more than the agreed upon $10,000 per month, despite not collecting enough to cover his expenses. As the bookkeeper, [Shelly] knew that [J.R.] was withdrawing more than the agreed upon amount . . . [and] [Shelly] signed some of the checks.

18

25 .   [J.R.'s] primary client was [Allstate]. Allstate terminated [J.R.'s employment] soon after formation of [D&O]. After losing Allstate, [J.R.'s] collections were. . . not even bringing in enough money to cover his expenses. He continued to take a draw and increase the debt owed to [D&O].

26.   While acting as [D&O's] bookkeeper, [Shelly] failed to disclose to [Dan] [J.R.'s] true financial situation, even though she had a duty to do so.

27.   Her fiduciary responsibility to [D&O] and its partners ended when she left the employ of [D&O].[2]

28.   As a result of reliance on the false representations and concealment of material facts by [Shelly], the Dabovals suffered damages.

29.   [J.R.'s] capital account with [D&O] for 2002 was a negative $5,500, meaning that he owed [D&O] $5,500.

30.   [J.R.'s] capital account with [D&O] for 2003 was a negative $76,547, meaning that he owed that much to [D&O], plus his balance from 2002.

31.   [J.R.'s] capital account with [D&O] for 2004 was a negative $75,800, meaning that he owed that much to [D&O], plus his balance from 2002 and 2003.

32.   [D&O] was dissolved and [Dan] is the successor-in-interest to [D&O].

. . . .

The trial court concluded,

---

[2]   Although the trial court found that the O'Briens owed the Dabovals a fiduciary duty, it concluded that the Dabovals failed to establish a specific breach of that duty.

19

1.  This Court previously declared [D&O] to be judicially wound up and terminated and that [D&O's] claims are personal claims of [Dan]. Therefore, [Dan] is entitled to pursue [D&O's] claims against [Shelly] in his individual capacity.

2.  [Shelly] had a duty to disclose information concerning the current financial condition of [J.R.] to [Dan].

3.  [The Dabovals] recover from [Shelly] for fraud and fraudulent concealment in the amount of $157,847.00.

. . . .

## Standard of Review

In an appeal of a judgment rendered after a bench trial, a trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them just as we would review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In determining whether legally-sufficient evidence supports the finding under review, we must consider evidence favorable to the finding, if a reasonable fact finder could consider it, and disregard evidence contrary to the

finding, unless a reasonable fact finder could not disregard it. *Id.* at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex. App.—Dallas 2003, pet. denied). We will sustain a legal-sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

In reviewing a factual-sufficiency challenge, we consider and weigh all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Plas-Tex,*

*Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must show that there is insufficient evidence to support the adverse finding. *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist] 2004, no pet.).

We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *In re Moers*, 104 S.W .3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *BMC Software Belgium, N.V.*, 83 S.W.3d at 794; *Holloway–Houston, Inc. v. Gulf Coast Bank & Trust Co.*, 224 S.W.3d 353, 357 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If we determine that a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *BMC Software Belgium, N.V.*, 83 S.W.3d at 794.

Finally, we note that the trial court acts as fact finder in a bench trial and is the sole judge of the credibility of witnesses. *See Murff v. Murff*, 615 S.W.2d 696,

700 (Tex. 1981); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

**Judgment Conforming to Findings of Fact**

In her first issue, Shelly argues that the judgment rendered in favor of Wendy must be reversed because it does not conform to the trial court's findings of fact. Shelly asserts that the trial court "expressly found" that the damages it awarded to the Dabovals "consisted of J.R.'s negative capital account with the Firm." Shelly notes that, in the trial court's order "winding up and terminating" D&O, it ordered that D&O's claims "became Dan's personal claims, individually."

When a trial court makes findings of fact, they "shall form the basis of the judgment upon all grounds of recovery." TEX. R. CIV. P. 299. If the findings of fact and the judgment are in conflict, the unchallenged findings control over the judgment. *See Morton v. Hung Nguyen*, 369 S.W.3d 659, 676 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Lone Star Ford, Inc. v. McGlashan*, 681 S.W.2d 720, 725 (Tex. App.—Houston [1st Dist.] 1984, no writ) (stating that "the judgment of the court should conform to its findings of fact").

In their pleadings, and during trial, the Dabovals sought recovery of damages for the financial losses that they suffered as a result of Shelly's fraud, and they presented evidence demonstrating a variety of damages and losses. The Dabovals presented evidence of J.R.'s negative capital account with D&O from

23

2002 through 2006. The Dabovals also presented evidence of the amount that Dan funded to the D&O bank account and the amount of the personal bank account that the Dabovals posted as collateral for the firm's obligation. In its judgment, the trial court concluded that Shelly had committed common law fraud by making false representations and failing to disclose material information, "thereby damaging [the Dabovals] in the amount of $157,847." The trial court found, among other things, that Shelly fraudulently induced Dan to form a partnership with J.R. and fund the firm account so that Shelly could "pay off other obligations." It also found that J.R. took excessive draws from this account, Shelly knew that J.R. was taking more than the agreed upon draws, and Shelly signed "some of the checks." The trial court further found that, as a result of their reliance on Shelly's false representations and concealment of material facts, the Dabovals "suffered damages." Also, within its findings, the trial court calculated J.R.'s capital account for the years of 2002, 2003, and 2004, which totaled a negative amount of $157,847. The trial court noted in its findings that this meant that J.R. owed D&O this amount of money. However, the trial court did not make any additional findings pertaining to damages, and it did not directly tie, at least in its findings of fact, the actual amount of damages that it awarded in its judgment to any specific piece of evidence or factual theory of recovery.

Although the amount of damages awarded by the trial court corresponds to the trial court's findings regarding J.R.'s negative capital account for the years 2002 through 2004, and although the court concluded that Dan was entitled to pursue any D&O claims personally because D&O had dissolved and he was its successor, we cannot say that the trial court's judgment in favor of Wendy is inconsistent or fails to conform with the findings in such a way that the judgment must be modified. It is true that the trial court did not make any findings suggesting that Wendy should recover in any capacity as a successor to D&O. However, simply because the trial court found that D&O was dissolved and Dan succeeded to any D&O claims does not create a conflict, in any legal sense, with its award of damages to Wendy.[3] Accordingly, we hold that the trial court's award of damages to Wendy in the judgment does not conflict with its findings of fact in such a way that the judgment must be modified to conform to the findings of fact.

We overrule Shelly's first issue.

### Misrepresentations

In her second issue, Shelly argues that the "affirmative misrepresentations" found by the trial court to have been made by her do not support the trial court's judgment because these representations constitute "mere expressions of opinion"

---

[3]     Shelly has separately challenged the legal- and factual-sufficiency of the evidence supporting the damages awarded to both Dan and Wendy, and we address these arguments below.

25

and are "not actionable" for common law fraud. Shelly asserts that "[f]uture predictions and opinions" cannot form the basis of a fraud claim, there is no evidence that she "had special knowledge of future events," and there is no evidence that Shelly knew her statements about the status of J.R.'s law practice were false.

The elements of common law fraud are (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Id*. "Pure expressions of opinion are not representations of material fact," and, as such, cannot give rise to a fraud claim. *Id*. at 337–38. "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Id*. at 338 (citing *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)). Relevant circumstances include the statement's specificity, the speaker's knowledge, the

26

comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *Transport Ins. Co.*, 898 S.W.2d at 276; *see also Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 338 ("Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion."). Additionally, there are exceptions to this general rule that an opinion cannot support an action for fraud. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 337–38. For example, when an opinion is based on past or present facts, special knowledge may support a fraud claim. *Id.*; *see also Transport Ins. Co.*, 898 S.W.2d at 277 ("Superior knowledge by one party may also provide the occasion for fraud.").

Shelly's argument is based on an overly-narrow interpretation of the trial court's findings. She asserts that the trial court found that she made only two "affirmative representations": (1) that J.R. would be "receiving several thousand dollars" from BOPC and (2) that J.R. "had a thriving practice with established clients." However, the trial court's findings were not so limited. The trial court further found that Shelly "handled the family finances"; was "familiar with the status of [J.R.'s] collection efforts in his practice"; was "at least aware of the contents of the Financial Statement [supplied to Dan], if in fact, she did not prepare it"; was aware that "instead of receiving money from BOPC" there would be a "substantial liability"; knew that the Dabovals "were not aware of J.R.'s

27

obligations to BOPC, the true status of his practice, and the inaccuracies in the Financial Statement and failed to disclose them"; intended for the Dabovals to "rely upon her representations and the Financial Statement"; intended to induce Dan to form and capitalize D&O for her and J.R.'s personal financial gain and benefit and to pay other obligations; and feared that disclosure of her family's financial condition and the "actual state" of J.R.'s practice would result in Dan not forming D&O or would restrict her ability to access D&O's account and funds. Thus, the trial court's findings, when considered as a whole, include a more general finding that Shelly was well aware of the contents of the financial statement and she intended to induce Dan, at least in part, with this financial statement, to form D&O and continue to operate it for her and her family's financial benefit. The evidence also supports the trial court's finding that the representations made by Shelly, including the representations in the financial statement upon which Shelly intended for Dan to rely, were false.

Moreover, the trial court's finding that Shelly had represented that J.R. would be receiving "several thousand" dollars from the wind up of BOPC is more significant when considered in the context of the trial court's other findings and supporting evidence. The trial court also found that Shelly was "familiar with the status of [J.R.'s] collection efforts in his practice," and the evidence supports this finding. As noted above, there is evidence that, during the same general time

28

frame that Dan was forming D&O, with the assistance of Shelly, J.R. was, also with the assistance of Shelly, resolving a dispute with BOPC. There is also evidence that Shelly was involved in preparing J.R. for his negotiations with BOPC to settle their outstanding financial disputes. J.R. testified that Shelly was involved in looking at compensation formulas and receivables so that he could discuss "actual numbers." The Dabovals also presented evidenced that, despite all of this, neither Shelly nor J.R. made any mention of the significant outstanding obligations that J.R. owed to BOPC. In fact, as found by the trial court, instead of disclosing any obligation whatsoever, Shelly and J.R. instead represented that BOPC owed J.R. significant amounts of money. Thereafter, the O'Briens continued to represent that they were expecting to receive substantial sums of money from BOPC, even though Shelly also provided conflicting testimony that she became aware shortly after the formation of D&O that no funds would be obtained from BOPC. As indicated in the financial statement, J.R. represented that he was anticipating the receipt of $25,000 to $50,000 from BOPC. There is also evidence that although the financial statement was signed only by J.R., Shelly was involved in preparing it. And the trial court found that Shelly specifically intended for Dan to rely upon the information in the financial statement in making his decisions to form, capitalize, and continue to operate D&O.

29

In support of her argument that her representations in this case constitute mere non-actionable opinions, Shelly relies upon *Bennett v. Cochran*, No. 14-00-01160-CV, 2004 WL 852298 (Tex. App.—Houston [14th Dist.] Apr. 22, 2004, no pet.) (mem. op.). In *Bennett*, Cochran alleged that his former law partner, Bennett, had made negligent misrepresentations prior to their forming a law firm. *Id*. at *4–5. Cochran asserted that Bennett had represented that his current law firm "was a viable firm, with substantial cases" and his "formaldehyde docket" consisted of "good cases that were worth a lot of money." *Id*. In support of the allegations, Cochran testified that, "I thought that we were merging into a viable law firm with a substantial number of cases and with competent staff and I thought I was merging in with a partner with whom I could work." *Id*. The court of appeals concluded that this evidence concerned only Cochran's "thoughts and beliefs" and did not reflect any actual representation. *Id*. In regard to the representation concerning the "formaldehyde docket," Cochran testified that Bennett had told him that they were "good cases and there was a lot of money to be made." *Id*. at *6 The court of appeals concluded that such statements constitute "nonactionable 'puffing' or expressions of opinion as to the value of these cases." *Id*. at *6 (citation omitted).

The specific financial information and representations at issue in this case, and the continued false representations and non-disclosures of material fact

30

throughout the parties' relationship, cannot be compared to the general statements of opinion concerning "good" cases in *Bennett*. Here, there is evidence that Shelly was involved in preparing the financial statement provided to Dan and the statement included material, false representations and omissions of material fact concerning both the O'Briens' personal financial situation and J.R.'s expectation of significant compensation due from BOPC. Dan testified that the information in the financial statement addressed his concerns regarding the O'Briens' ability to pay the line of credit, and it is undisputed that the financial statement was presented to and used by the bank to issue the line of credit. Accordingly, we hold that the record evidence supports the trial court's findings that Shelly made material, false representations that legally support a fraud claim. Thus, the trial court's judgment does not fail on the ground that the pertinent statements and representations made by Shelly were merely non-actionable statements of opinion.

We overrule Shelly's second issue.

### Reliance

In her third issue, Shelly argues that the "undisputed evidence conclusively negates Dan's purported reliance" on the financial statement supplied to him because "Dan opened the Firm operating account—thus committing to the formation of the firm with J.R.—before he ever saw the Financial Statement" and D&O "had already been created before J.R. signed the Financial Statement."

Although there is evidence that Dan and J.R. had agreed to form D&O prior to Dan's review of any financial statement, and although there is evidence that the parties had already taken affirmative steps to form D&O, there is also evidence that supports the trial court's fact finding that the financial statement was prepared and presented to Dan to induce him to continue to operate and capitalize D&O and to agree to be bound to a letter of credit. We note that, while there is evidence that Dan had agreed to start the process of forming D&O prior to any financial review, the Dabovals presented evidence that the initial agreement had been for both the Dabovals and the O'Briens to capitalize D&O with cash contributions. This initial oral agreement changed when the O'Briens notified Dan that they could not furnish any capital. And Dan testified that he relied upon the provided financial statement, and the material representations made therein, in making his decisions to proceed to form and continue to operate D&O. Accordingly, we hold that the evidence is legally sufficient to support the trial court's finding that Dan relied on Shelly's false representations in making his decisions to form, continue to operate, and capitalize D&O and to obtain the line of credit for the benefit of D&O and the O'Briens.

We overrule Shelly's third issue.

## Justifiable Reliance

In her fourth issue, Shelly argues that the evidence "conclusively establishes" that Dan's purported reliance on the O'Briens' "Financial Statement" and "lifestyle" was unjustifiable as a matter of law because Dan "admitted he never had any discussions with the O'Briens about their financial situation at the time the line of credit was being considered," Dan's testimony "reveals nothing more than [his] subjective trust in the O'Briens" as "friends" and "partners," Dan had no "check or balance" on Shelly's duties, Dan did not check the books and records, and Dan did not ask for documentation to support J.R.'s expectation of receiving thousands of dollars from BOPC.

To recover on a fraud claim, a plaintiff must show actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). To determine whether reliance is justifiable, "we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Id.* (citing *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990) (applying Texas law)). A plaintiff "may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted." *Id.* (citation omitted).

Dan would not have been entitled to justifiably rely merely upon the O'Briens' "lifestyle" in agreeing to form, operate, and fund D&O and to continue to operate D&O and allow the O'Briens to make withdrawals from the D&O account. But, even setting aside the fact finding regarding the O'Briens' "lifestyle," we cannot say that the evidence is insufficient to support the trial court's findings that Dan justifiably relied on the provided financial statement and Shelly's representations, which occurred throughout the parties' business relationship. Dan testified that, before agreeing to the O'Briens' request for a line of credit, he wanted to first review the O'Briens' financial statement, which was ultimately filed with the bank. This financial statement, sworn to by J.R., purportedly disclosed all of the O'Briens' assets and liabilities. And the record supports the trial court's finding that Dan and J.R. discussed the financial statement and the information disclosed therein before Dan agreed to obtain the line of credit, i.e., Dan relied upon the information provided to him in the financial statement. The record also supports the trial court's finding that Shelly was aware of the statement and intended that it be used to induce Dan into forming, funding, and continuing to operate D&O. Although the financial statement makes reference to the existence of other documents, and although Dan agreed that he did not see these other documents, we cannot say that, under these circumstances, it was

34

unjustifiable, as a matter of law, for Dan to have relied upon information disclosed to him by the O'Briens in a sworn financial statement.

We also cannot say that it was unjustifiable, as a matter of law, for Dan to have relied upon Shelly's other statements made to him in her capacity as D&O's bookkeeper regarding financial information pertaining to the continued operation of D&O. The record reveals that Shelly, considered to be a knowledgeable and trusted bookkeeper and employee based upon her financial and project management background, was given authority over D&O's accounts and financial matters. The evidence demonstrates that Shelly worked with D&O accountants and had significant involvement in starting and operating the firm. And she acknowledged that Dan relied upon her for information concerning the financial status of D&O. Accordingly, we hold that the evidence is legally sufficient to support the trial court's finding that Dan justifiably relied on Shelly's false representations.[4]

---

[4] In support of her arguments regarding justifiable reliance, Shelly again cites *Bennett v. Cochran*, No. 14-00-01160-CV, 2004 WL 852298 (Tex. App.—Houston [14th Dist.] Apr. 22, 2004, no pet.) (mem. op.). In *Bennett*, after holding that certain statements made by Bennett to Cochran were mere "puffing," the court alternatively noted that Cochran had not justifiably relied upon Bennett's statements that he had "good cases" on which "a lot of money" could be made. *Id.* at *6. The court noted that Bennett had not told Cochran "one way or the other" whether he could review any documents relating to Bennett's prior law firm and Cochran had never asked to review any such records. *Id.* The court concluded that, under these circumstances, there was no evidence that Cochran's reliance on "general statements" about "good cases" worth "a lot of money" was justifiable. *Id.* Here, there is evidence that, during the initial months of the partnership, the

35

We overrule Shelly's fourth issue.

## Damages

In her fifth issue, Shelly argues that the evidence "conclusively established" that Dan was "responsible for nearly all the damages" because Dan "made a conscious decision in 2003 and 2004 to continue" D&O and allow J.R. to take his $10,000 monthly draws, all while D&O was "in the hole" and J.R. was "under water." Within this issue, Shelly also argues that "the judgment may not be affirmed on the ground that Dan was fraudulently induced into continuing to operate the Firm" because the trial court made no findings in this regard. Finally, Shelly alternatively asserts that the case should be remanded for a new trial if there is any legally sufficient evidence of "some damages."

The ordinary measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct. *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996); *McWhorter v. Sheller*, 993 S.W.2d 781, 785 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

The trial court found that Shelly intended to induce Dan into forming a partnership and capitalizing it so that she could "payoff other obligations." The trial court also found that Shelly feared that if she disclosed to Dan certain material

O'Briens submitted to Dan a sworn financial statement that contained material and false representations upon which the O'Briens intended him to rely to induce him to form, operate, and capitalize D&O.

facts, he would have restricted her access to the firm account, again indicating that Shelly's fraudulent conduct resulted not only in Dan's formation and capitalization of D&O but also his continued operation of D&O. The trial court further found that Shelly was D&O's bookkeeper from its inception through the spring of 2004; during this time, she failed to disclose that J.R. was withdrawing from the firm's bank account amounts that exceeded what Dan had agreed to allow; she failed to disclose J.R.'s "true financial situation" during the partnership, even though she had a duty to do so; and the Dabovals suffered damages in reliance upon Shelly's false representations and failures to disclose material information. Thus, the evidence presented at trial does not establish that Dan was responsible for "nearly all" of his damages.

The record demonstrates that because Dan was induced into forming, capitalizing, and continuing to operate D&O, the amount of damages is not necessarily subject to an exact calculation. Thus, the award of damages was a matter well suited for the fact finder to resolve. We note that although the trial court's findings do not directly tie the Dabovals' damages to a specific factual theory, the findings indicate that the trial court may have sought to limit the Dabovals' claimed damages to those losses sustained through some point in 2004. The findings of fact also suggest that the trial court determined that the Dabovals were entitled to recover an amount generally consistent with J.R.'s negative capital

account through that time period, but there is no express finding that the damages were limited on this basis. Rossi testified that his calculations, which accounted for firm profits and expenses, were "conservative."

Whether Dan's continued reliance upon Shelly's and J.R.'s representations through 2004 remained justifiable was also a fact issue well suited for resolution by the fact finder. As Shelly notes, there is some evidence that would likely have supported a finding that Dan's reliance became unjustifiable at some point during the partnership when he realized that the O'Briens remained "under water" and J.R. was not "catch[ing] up." But, as explained above, there is also evidence that, during the relationship and partnership, the O'Briens continued to represent that they were expecting to receive payments from BOPC, they would provide substitute collateral, and they understood that they were personally liable for what Dan considered to be a "bridge loan." There is also evidence that the Dabovals remained unaware that the O'Briens representations made in the sworn financial statement were false, the O'Briens' dealings and disputes with BOPC resulted in a significant financial obligation for them, and the O'Briens had taken draws from D&O's bank account in excess of amounts agreed by Dan. Based upon our review of the record, we cannot say, as a matter of law, that Dan's reliance became unjustifiable at any specific point in 2004.

Additionally, Shelly does not appear to argue that the amount of J.R.'s negative capital account was irrelevant to a determination of damages or the trial court would have erred in at least considering the amount of the account. Again, the Dabovals presented the testimony of Rossi, an accountant who reviewed all the partnership records, considered all of the profits and expenses, and calculated that J.R. owed an amount generally consistent with the trial court's award. As noted above, Rossi explained that his suggested figure was "conservative." The Dabovals also presented evidence that, in addition to losses in an amount consistent with J.R.'s negative capital account, they sustained additional losses related to the bank's seizure of their personal bank account, which contained over $100,000.

Based upon this evidence, as well as the evidence supporting the trial court's findings that Shelly's fraud induced Dan to form, capitalize, and continue to operate D&O, we cannot say that the trial court's award of damages in an amount generally consistent with J.R.'s negative capital account through 2004 resulted in the award of excessive damages that lacks sufficient evidentiary support. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's award of damages.

**Conclusion**

We affirm the judgment of the trial court.

                                        Terry Jennings
                                        Justice

Panel consists of Justices Jennings, Massengale, and Huddle.