**Opinion issued August 20, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00117-CV

———————————

**EUN BOK LEE, Appellant and Cross-Appellee**

**V.**

**HO CHANG LEE, Appellee and Cross-Appellant**

———————————

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2005-57998**

———————————

## O P I N I O N

Appellee Ho Chang Lee sued his former landlord, appellant Eun Bok Lee, for breach of contract, wrongful eviction, conversion, theft, and unjust enrichment after the conclusion of a 12-year leasing relationship. After a jury trial, the trial

court entered judgment in favor of the tenant, but it did not award exemplary damages that the tenant requested and the jury found. The landlord appeals, primarily arguing that insufficient evidence supported the jury's findings regarding several of the tenant's theories of liability. The tenant also appeals, challenging the trial court's failure to award exemplary damages in the judgment. We reverse the portion of the trial court's judgment which awarded the tenant treble statutory damages for the amount of the security deposit, remand to the trial court for recalculation of the award of prejudgment interest, and affirm the judgment in all other respects.

## Background

This appeal involves a dispute over whether, in the sale of a convenience-store business and the lease of its premises, several pieces of equipment connected to the store, including several large underground gasoline storage tanks, were sold or merely leased. In 1993, pursuant to a Korean-language sales agreement, Eun Bok Lee sold his business, "Lee's Chevron," to Ho Chang Lee. The parties also entered into a separate English-language lease agreement for the premises. The lease also had an addendum written in Korean.

The sales agreement was titled "Sales Contract." At trial the parties introduced different English translations of the contract, which differed as to whether the contract transferred "ownership" or "possession" of items listed in the

2

contract. Both translations identified Eun Bok Lee and his wife, "owners and operators of a gas station and convenience store known as Lee's Chevron," as "sellers," with Ho Chang Lee and his wife identified as "buyers." According to the buyer-tenant's translation, the contract provides the following terms:

1. Name of Business: Lee's Chevron's assumed name shall be changed to the Buyers.

2. Sales Price: $120,000, plus inventory. The inventory shall be calculated as 30% less than retail price.

3. Items to Transfer of Ownership:

   a. Inventory (as in the above, number 2)

   b. Items:

        Cashier Machine   (one)
        Air Compressor (one)
        Ice Creame refrigerator (one)
        Ice Cube refrigerator (one)
        Dolly (one)
        Fire Extinguisher   (two)
        Ladder (one)
        Coffee Maker (one)
        Filing Cabinet (one)
        Walk in Cooler (one)
        Ground Gasoline Tank (three)

4. Leased Items:

        Ice Machine (one)
        Soft Drink Dispenser (one)
        Ice Cube Dispenser (one)
        Credit Card Machine (one)
        Alarm System (one)
        Trash Dump (one)

3

5. The installation cost of Gasoline Nozzle Vacuum System that is required by Texas or federal governments is expected to be about $20,000.00. It is planned that the construction is planned in November 1993. This cost will be paid by the Buyer; however, if the cost exceeds $20.000.00, Sellers agreed to pay Buyer the difference.

6. Payment: At the execution of the agreement, Buyer shall pay $15,000.00, and the remaining balance of the sales price shall be paid as soon as possible before the transfer of possession. The cost of inventory shall constitute a loan at interest of 8% per annum, and total amount due shall be paid in one or two years. In the event that total balance is not paid, the business shall not transfer.

7. Transfer: June 27, 1993, after business inventory shall be taken before transfer.

The seller-landlord's translation differs in that paragraph 3 of the contract states: "Items identified for the transfer of the possession." Also in the seller-landlord's version, paragraph 7 references "Transfer of the Possession," rather than simply "transfer."

In accordance with this sales agreement, the buyer-tenant paid the seller-landlord $120,000 plus an additional $20,000 to $30,000 more for the value of the inventory. The buyer-tenant testified that he believed this purchase price included purchase of the items listed under "Items," specifically including the underground storage tanks, because the landlord was worried about the risk of being responsible for a leakage of the tanks. The seller-landlord testified that he believed the $120,000 purchase price was paid to obtain the right to operate the business, but

4

that the listed items of equipment, such as the storage tanks and walk-in cooler, were only temporarily being transferred to the possession of the buyer-tenant for the duration of the lease.

The agreement for the lease of the premises provided for a six-year term and monthly rent of $3,500. It provided that: "All alterations, additions, and improvements, except trade fixtures, installed at expense of Tenant, shall become the property of Landlord, and shall remain upon and be surrendered with the leased premises as a part thereof on the termination of this lease." The lease also provided: "Adjustment to the rent, if any, for rent escalations, for percentage of net rent, or for increases in building operation costs (including, but not limited to insurance, custodial services, maintenance, and utilities) shall be set forth in an attached addendum."

The lease addendum, titled "Additional Agreement," stated with respect to the rent:

> The rent shall be frozen for three years from the effective date of the lease. Thereafter, the rent shall be adjusted once every year, taking into account of increase in price index, property tax, insurance premium, etc. and in commensurate with such increase.

The addendum set the amount of the security deposit at $3,500, to be paid within one year of signing. The "owner" would purchase insurance for the building, while the lessee was obligated to purchase the insurance for the "gas tanks, fixtures and furniture, inventory, workmen's compensation, liabilities and all others."

Three years later, at the end of the period during which rent was set at $3,500, the landlord sent the tenant a "Gas Station Rent" contract. The contract provided that the monthly rent would increase from $3,500 to $4,300 a month, "and other terms shall remain unchanged." Although the tenant disagreed that the rent increase reflected a change based on the consumer price index as agreed in the lease addendum, he signed the new rent contract and paid the increased monthly rent. At the end of the initial six-year lease term in 1999, the parties extended the lease for an additional six years. During the second six-year term, the landlord increased the rent three additional times, listing an inflation rate for the previous year as the reason for each rent increase. For the year 2000, the landlord increased the monthly rent to $4,532, based on a stated inflation rate of 5.4%. Rent was increased to $4,650 in 2001, and it increased to $4,750 in 2002.

In spring 2005, near the conclusion of the final lease term, the tenant's son and the landlord's son agreed to arrange a transfer of the ownership of the business back to the landlord and his son. The parties agreed to hire a professional to value the remaining inventory in the store. They also agreed to meet to transfer the possession of the store on May 31, although the final rent period was from May 15 to June 15. As part of this process, the tenant expected to receive payment for the items at the store, including those items he believed he had purchased in the sales contract.

On May 31, 2005, the landlord's son proposed to transfer possession of the store in exchange for a check for the value of the inventory, which was assessed at a wholesale value of $18,000. The tenant's son refused the check, however, because he insisted that the landlord owed an additional $100,000 for the gasoline tanks and other equipment listed in the sales contract. The tenant's son presented a copy of the original sales contract, explaining that the tenant expected to be paid the value of the gasoline storage tanks and other equipment in addition to the inventory before he would turn over the business. The landlord's son was not prepared to pay this much, and he suggested that their fathers meet to resolve the disagreement. The tenant's son then left. At that time, the landlord changed the locks to the store, although he had not told the tenant in advance he would do so. Thus without paying for the inventory or any other items, the landlord and his son took possession of the premises, and they canceled the regular order to refill the gas tanks.

Thereafter, the landlord and the tenant met, along with their sons. The tenant insisted that the gasoline tanks belonged to him, and he demanded money for them because he believed the original price he paid for the business of $120,000 included that equipment. The landlord refused to pay because he believed that he had not sold the equipment, such as the tanks and the walk-in cooler, but that he would receive those items back at the end of the lease.

After the unsuccessful meeting, the tenant's lawyer sent a letter informing the landlord that the tenant protested the lock-out and early termination of the lease. In the letter, the tenant's lawyer noted "that the parties have agreed to apply the security deposit of $3,500 to be applied toward the last month's rent," but the landlord "sent no notice of termination of the lease agreement or a notice to vacate the premises." The tenant demanded immediate re-entry, complained that the landlord charged rent in excess of the consumer price index rate for years, and demanded payment for the overcharged rent and the equipment listed in the 1993 sales contract. In response, the landlord sent a letter to the tenant demanding $10,151.61 in payment for damages to the store and unpaid rent from May 15 to May 31, reduced by the amount of the security deposit. He also asked for the tenant to disconnect the utility services to the store. Unless the tenant paid the requested sum, the landlord threatened to "liquidate [the tenant's] inventory and asset[s] appropriately and send him the liquidation report within 60 days after June 28, 2005."

The landlord and his son left the store closed until July 1, in part because they were unable to obtain a license to sell the beer inventory. During this period, the store's power was turned off, damaging the perishable inventory. Ultimately, the landlord never paid the tenant for the inventory, and the tenant never collected the inventory from the store. The landlord's son stored some of it, and then,

sometime before reopening the store, the remaining inventory was "liquidated." Once the store was reopened in July, the landlord and his son used the underground gasoline tanks, the walk-in cooler, and the vapor recovery system (referenced in the sales agreement as the "Gasoline Nozzle Vacuum System") to operate the business.

The tenant sued the landlord. In his amended pleadings, the tenant asserted numerous causes of action, including breach of contract, conversion, theft, unjust enrichment, wrongful eviction, fraud, and promissory estoppel. The landlord counterclaimed for breach of the lease agreement. At trial, the landlord introduced evidence in support of his contention that he owned the gasoline tanks. From 2001 to 2005, the landlord was registered as the "owner/operator" of the tanks with the Texas Commission of Environmental Quality's petroleum storage tank program, which records self-certification of the tanks as being "compliant with all technical and administrative standards for fuel delivery." The landlord also introduced a copy of a property tax form that the tenant submitted to the Harris County Appraisal District in 1994, showing that the tenant did not specifically list the gasoline tanks as part of his property, only "store fixtures" and the "vapor recovery system."

At trial, the jury found that the landlord overcharged for rent from 2001 to 2005 and wrongfully retained the security deposit, wrongfully evicted the tenant by

9

locking him out, converted the tenant's property, committed theft, and unjustly enriched himself at the tenant's expense. The jury also determined that the tenant was entitled to the value of his security deposit and the amount of overcharged rent as damages for the contract claim, and one-half month's rent as actual damages for wrongful eviction. In three separate questions corresponding to the causes of action for conversion, theft, and unjust enrichment, the jury awarded identical amounts of damages for fourteen separate items. The jury also awarded damages for overcharged rent under the unjust enrichment cause of action. Altogether, the jury's damages findings were as follows:

| | |
|---|---|
| Security deposit | $3,500.00 |
| Overcharged rent | $16,968.00 |
| Actual damages for wrongful eviction | $5,000.00 |
| Month's Rent for wrongful eviction | $2,375.00 |
| Inventory (grocery) | $18,810.00 |
| Inventory (gasoline) | $2,249.60 |
| Underground Gasoline Tank (3) | $80,000.00 |
| Ice Maker | $2,150.00 |
| Ice Storage | $500.00 |
| ATM Machine | $1,500.00 |
| Single Beer Container | $1,300.00 |
| Coffee Maker | $200.00 |
| Ice Cream Freezer | $350.00 |
| Vapor Recovery System | $10,000.00 |
| Walk-in Cooler | $7,500.00 |
| Ginseng Energy Drink | $1,400.00 |
| Decorations for sale (in boxes) | $2,100.00 |
| | |
| *Total* | *$155,902.60* |

10

The jury also determined that the tenant was entitled to recover attorney's fees and $450,000 in exemplary damages.

Based on these findings, the trial court entered judgment in the tenant's favor. The damages award listed $152,402.60 as "principal amount due," which is the same amount as the total of all the jury's damages, minus the amount for the security deposit. The judgment separately awarded $10,500 in "statutory damages on failure to return security deposit." Additionally, it awarded $50,263.51 as prejudgment interest on the non-exemplary damages and $55,000.00 in attorney's fees. The judgment did not specify the theory of liability on which it awarded damages, and it did not award exemplary damages. The landlord then timely filed this appeal. The tenant filed a cross-appeal, contesting the trial court's failure to enter an award for exemplary damages.

**Analysis**

In his appellant's brief, the landlord states that the trial centered on a "single disputed ownership issue": whether the tenant purchased the gas station's equipment, including the gasoline storage tanks, when he purchased the business from the landlord, or whether he merely obtained temporary possession of those items. Although he relies upon the 1993 sales contract to frame the dispute, the landlord nevertheless does not dispute on appeal that there was sufficient evidence in the form of the parties' differing translations and testimony about the meaning

11

of the Korean-language sales contract for the jury to conclude that the tenant had purchased the property listed in the sales agreement. Instead, the landlord challenges the legal sufficiency of the evidence to support the jury findings on breach of contract, wrongful eviction, conversion, theft, unjust enrichment, and damages for those claims.

When a party attacks the legal sufficiency of an adverse finding on which he did not have the burden of proof, he must show that there is no evidence to support the adverse finding. *O'Brien v. Daboval*, 388 S.W.3d 826, 837–38 (Tex. App.—Houston [1st Dist.] 2012, no pet). In conducting a legal-sufficiency review, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id*. at 822. We will sustain a no-evidence point only if: (1) the record reveals a complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If more than a scintilla of evidence exists to support the finding, the legal sufficiency

12

challenge fails. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)).

The factfinder is the sole judge of the credibility of witnesses and the weight to be given their testimony; the factfinder is free to choose to believe one witness over another. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003)). It is for the factfinder to resolve conflicting evidence, and we may not impose our own opinion in opposition to the factfinder's implied credibility determinations. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

When construing a contract, our primary concern is to ascertain and give effect to the intent of the parties as objectively manifested in that contract. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam). Whether a contract is ambiguous is a question of law, which we review de novo. *Pitts & Collard*, 369 S.W.3d at 313; *see also Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). If

the words used in the written instrument can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and we will construe the contract as a matter of law. *Toler v. Sanders*, 371 S.W.3d 477, 480 (Tex. App.— Houston [1st Dist.] 2012, no pet.) (citing *Coker*, 650 S.W.2d at 393). Courts must enforce an unambiguous contract as written. *Id.* at 480–81; *Tellepsen Builders*, 325 S.W.3d at 696.

A contract is ambiguous if, after applying established rules of construction, its meaning is uncertain and doubtful or the writing is reasonably susceptible to more than one meaning. *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999); *Coker*, 650 S.W.2d at 393. A writing is not ambiguous merely because it lacks clarity or because a disagreement in interpretation arises. *DeWitt Cnty. Elec. Coop.*, 1 S.W.3d at 100; *Tellepsen Builders*, 325 S.W.3d at 696. In determining whether a contract is ambiguous, courts construe and harmonize all provisions of the contract to discern the parties' intent. *Coker*, 650 S.W.2d at 393; *Tellepsen Builders*, 325 S.W.3d at 695. This inquiry also considers the context of the agreement of the parties and the circumstances present when the agreement arose. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). If the contract is ambiguous as a matter of law, only then is parol evidence of the parties' interpretation of the contract admissible. *Pitts & Collard*, 369 S.W.3d at 313.

## I. Breach of contract

The jury found that the landlord had breached the lease agreement, determining that the tenant was owed compensation of $16,968 for overcharged rent between 2001 and 2005 and $3,500 for wrongful retention of the security deposit. The landlord contends that there is conclusive evidence negating these findings.

## A. Overcharged rent

First, the landlord argues that it is undisputed that the tenant agreed to the rent increases because the tenant agreed to extend the lease in 1999 for an additional six-year term, knowing that rent was set at $4,300 a month since 1996, and the subsequent invoices the landlord sent to the tenant all included calculations for yearly consumer price index increases.

The 1993 lease agreement provided that the monthly rent, which was originally set at $3,500, may be adjusted "as set forth in the attached addendum." The addendum stated that after an initial three-year period during which time the amount of rent was "frozen," "the rent shall be adjusted once every year, taking into account of increase in price index, property tax, insurance premium, etc. and in commensurate with such increase." After increasing rent to $4,300 in 1996 pursuant to the parties' written agreement, the landlord increased rent to $4,532 in the year 2000, based on a consumer price index increase of 5.4% over a period of

two years; to $4,650 a month in the year 2001, based on a rate of 3.7%; and to $4,750 from 2002 to 2005, based on a rate of 3.2%.

There were several pieces of evidence introduced to challenge the landlord's rent adjustments under the terms of the lease addendum. The tenant introduced a Bureau of Labor Statistics consumer price index report, showing that the landlord's listed inflation rates in support of his increases from 2001 to 2003 used a different consumer price index rate than the official consumer price index rates for either the nation or the Houston area. The landlord's own testimony indicated that the rent increases were not always calculated under the terms of the addendum. When asked whether any of the increases in the rent amount reflected increase in the consumer price index, property taxes, or insurance premiums—the factors authorized under the lease addendum—the landlord only stated that he did not "recall exactly," but "there was some increase" in those factors.

From this evidence introduced at trial, the jury could have found that the landlord unilaterally increased rent without proper reference to the lease addendum. The purported reliance upon the consumer price index to justify rent increases was disputed by evidence about the appropriate consumer price index rates, and the landlord's notices did not identify any other basis for the increases. Based on the conflicting evidence about the proper consumer price index and the

landlord's determinations, we conclude that some evidence supported the jury's determination that the landlord had overcharged rent.

## B.    Wrongful retention of security deposit

Second, the landlord argues that it was undisputed that the parties had agreed to apply the security deposit to the last month's rent.  He argues that there was no dispute regarding these facts or ambiguity to be resolved in the lease agreements, so there was no evidence of breach of contract.

The lease agreement provides that "Refund [of the security deposit] shall be made upon performance of this lease agreement by Tenant, minus any assessments or damages."  The tenant's son testified that the tenant never received the security deposit back from the landlord.  He also testified that they did not believe that the tenant was obligated to pay the last month's rent because they were wrongfully "kicked out" on May 31 and were still disputing the ownership of the gas station equipment when the final rent payment was due on June 15.  This was evidence from which the jury could reasonably conclude that the tenant was entitled to the security deposit, which the landlord could not apply to the rent period from May 15 to June 15 when no rent was necessarily due for that period.

The tenant's lawyer stated in a letter, dated June 9, 2005, that "[i]t appears that the parties have agreed to apply the security deposit of $3,500.00 to be applied to the last month's rent."  Under the circumstances of the landlord's lockout in the

middle of the rent period without paying for the inventory and the disagreement over the ownership of the equipment, however, this remark in a letter is not conclusive proof that the landlord could retain the security deposit to negate the jury's finding to the contrary. The factfinder is the sole judge of the credibility of witnesses and the weight to be given their testimony, and may resolve any conflicting evidence. *See Golden Eagle*, 116 S.W.3d at 761. Accordingly, there was sufficient evidence to support the jury's finding that the landlord breached his contractual duty to return the security deposit at the end of the lease. We therefore overrule the landlord's points of error on the sufficiency of the evidence supporting the award for breach of contract.

II. **Statutory damages for withheld security deposit (Property Code § 93.011)**

Although the tenant had not sought statutory damages in his pleadings or included an instruction for them in the jury charge, in his motion for entry of judgment he requested additional damages based on section 93.011 of the Texas Property Code. That section provides that a "landlord who in bad faith retains a security deposit" is liable for "three times the portion of the deposit wrongfully withheld." TEX. PROP. CODE ANN. § 93.011(a) (West 2007). The trial court awarded the triple damages in its judgment. The landlord argues that the trial court erred in awarding these damages because (1) the violation of the property code was

18

not pleaded, (2) the jury did not make a finding of bad faith as required by the statute, and (3) the issue was not tried by consent.

The purpose of pleadings is to give an adversary notice of claims, defenses, and the relief sought. *Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 64 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A trial court may not grant relief on a theory of recovery not sufficiently stated in the party's pleadings or tried by consent. *Id.*; *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 567 (Tex. App.—San Antonio 2011, no pet.); *see also* TEX. R. CIV. P. 301 ("judgment of the court shall conform to the pleadings"). Here, the issue of section 93.011 statutory damages for wrongful retention of the security deposit in bad faith was not raised in either party's pleadings. Thus, we must determine whether the issue was tried by consent.

An issue is tried by consent when both parties present evidence on an issue and the issue is developed during trial without objection. *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *see* TEX. R. CIV. P. 67 (issues not raised in pleadings that are tried by consent are "treated in all respects as if they had been raised in the pleadings"). Trial by consent is intended for the exceptional case in which it appears clearly from the record as a whole that the parties tried an unpleaded issue—it should be applied with care and never in a doubtful situation. *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 854 (Tex. App.—Dallas 2005, pet.

19

denied). "When evidence relevant to both a pleaded and an unpleaded issue has been admitted without objection, the doctrine of trial by consent should not be applied unless clearly warranted." *Id.* (relying on *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied)). The trial court has broad discretion in determining whether an unpleaded issue was tried by implied consent, but because implied consent is the exception and not the rule, it should not be allowed in doubtful cases. *Id.* at 855.

Although the jury charge included a question of whether the landlord had "wrongfully retained" the security deposit, section 93.011 damages are also predicated on a determination that the landlord retained the deposit "in bad faith." TEX. PROP. CODE ANN. § 93.011(a). The statute applies a presumption of bad faith for this purpose if the landlord either fails "to return a security deposit or to provide a written description and itemized list of deductions on or before the 60th day after the date the tenant surrenders possession." *Id.* § 93.011(d). The landlord may present evidence to rebut the presumption of bad faith, such as by providing a written and itemized schedule of damages. *See Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 701 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

This bad-faith issue was not tried by the parties. An issue is "not tried merely by the hearing of testimony thereon." *Ingram*, 288 S.W.3d at 893 (quoting

20

*Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445–46 (Tex. 1993)). Instead, the evidence on the issue must be developed under circumstances indicating both parties understood that the issue was in the case. *Prize Energy*, 345 S.W.3d at 567; *see also Ingram*, 288 S.W.3d at 892–93 (issue tried by consent when both parties presented evidence at trial on it and it was submitted in the jury charge). Here, there is a dearth of evidence that the parties tried the issue of whether the landlord retained the security deposit in bad faith. No testimony was elicited on whether his actions were in bad faith, as opposed to a good-faith disagreement about the interpretation of the parties' agreements. The landlord also did not present evidence to attempt to rebut the presumption of bad faith.

Accordingly, we sustain the landlord's point of error on the recovery of treble statutory damages for the unpleaded and untried statutory cause of action. Instead of recovering $10,500 for this claim, the judgment should be reduced by $7,000 in actual damages, such that the tenant recovers the $3,500 value of the security deposit with no trebling of such damages.

## III. Wrongful eviction

The jury found that the landlord wrongfully evicted the tenant by locking him out. The landlord challenges this finding because there was "undisputed evidence that the tenant Lee was delinquent in paying the rent." The jury charge instructed that the landlord may prevent a tenant from entering the leased premises

if the exclusion results from "changing the door locks of a tenant who is delinquent in paying at least part of the rent." The landlord also argues that there is insufficient evidence to support the amount of wrongful eviction damages found by the jury—$5,000 in actual damages and $2,375 in rent—and that the award of both actual damages and rent damages is an impermissible double recovery.

Contrary to the landlord's contention, the evidence was not undisputed that the last month's rent was delinquent when the landlord locked out the tenant. The tenant's son, who operated the gas station for his father, testified that the last month's rent would have been due on June 15, and that it was unclear whether the tenant was required to pay that rent because the store had been occupied by the landlord since May 31. No evidence was presented showing that the tenant was delinquent before May 31. Instead, both the landlord and the tenant's son testified that the parties had agreed to attempt to an orderly transfer of ownership of the business during May. During this time an inventory was taken, and the tenant's son testified that he spent some of the time training the landlord's son to operate the business. The parties agreed that they would meet on May 31 for the landlord to pay the tenant for the value of the inventory, but when the dispute arose the landlord changed the locks without paying the tenant. When the landlord changed the locks, he did not place written notice on the door "stating the name and the address or telephone number of the individual or company from which the new key

22

may be obtained," as required by the section 93.002(f) of the Texas Property Code, which governs a landlord's lockout of a commercial tenant. TEX. PROP. CODE ANN. § 93.002 (West 2007). Viewing this evidence in the light most favorable to the jury's finding, *see City of Keller*, 168 S.W.3d at 822, we conclude there was sufficient evidence to support the finding that the landlord wrongfully evicted the tenant.

Regarding damages, the tenant's son testified that the "take-home" profit for a month of business at the time of the lockout was $10,000. The landlord's attorney did not cross-examine the tenant's son on this issue or offer evidence controverting this estimate of the store's profits. This testimony was evidence from which reasonable jurors could determine that the wrongful exclusion from the store deprived the tenant and his family of $5,000, or half of a month's profits. *See French v. Moore*, 169 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (tenant's uncontroverted testimony that he was required to find another storage facility to store his "household contents" and request of $5,000 in damages sufficient to support the jury's award of $5,000 under TEX. PROP. CODE ANN. § 93.002). Again crediting evidence in the light most favorable to the jury's finding, we conclude that there was sufficient evidence to support the jury's finding of actual damages in the amount of $5,000.

The tenant's recovery for both rent and actual damages is not a double recovery, but instead it is expressly authorized by statute. A tenant who was improperly excluded from the premises may "recover from the landlord an amount equal to the sum of the tenant's actual damages, one month's rent or $500, whichever is greater, reasonable attorney's fees, and court costs, less any delinquent rents or other sums for which the tenant is liable to the landlord." TEX. PROP. CODE ANN. § 93.002(g)(2). By this provision, the tenant was authorized to recover the sum of both the amount of actual damages and one month's rent. We overrule the landlord's complaints on the issue of wrongful eviction.

## IV.    Damages for equipment and inventory

The jury found that the landlord converted the property of the tenant and determined the amount of damages based on the value of the inventory and equipment, including the gasoline storage tanks, vapor recovery system, and walk-in cooler. The jury also found that the landlord had committed theft, and it assessed damages based on the value of the same items. The landlord challenges the sufficiency of the evidence supporting these findings, specifically contending that the lease agreement returned ownership of the property to him after the tenant's abandonment of the gas station. The landlord also contends that there was conclusive evidence that the items for which the jury awarded conversion and theft damages were not personal property. Additionally, the landlord argues that

24

damages could not be awarded for several of the converted items because the award for the value of several of the fixtures, such as the gasoline tanks and walk-in cooler, must be reduced by the cost of removing the items from the property.

Both the conversion and theft causes of action require that the plaintiff establish that the property at issue is personal property, rather than real property attached to the land. Conversion is the wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Burns v. Rochon*, 190 S.W.3d 263, 267–68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Id.* at 268. A person "who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE ANN. § 134.003 (West 2011). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of it. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2012); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 134.002(2) (theft is defined by the Penal Code). To

appropriate property means "to acquire or otherwise exercise control over property other than real property," or to transfer title to property to one other than the property's owner. TEX. PENAL CODE ANN. § 31.01(4).

## A. Abandoned property

The landlord argues that insufficient evidence supported the jury's conversion and theft findings because there was undisputed evidence that the tenant abandoned the property. A landlord may remove and store any property of a tenant that remains on premises that are abandoned, and if he provides notice to the tenant, the landlord may dispose of the stored property if the tenant does not claim it within 60 days after the date the property is stored. TEX. PROP. CODE ANN. § 93.002(e). The lease agreement similarly provides:

> If Tenant abandons the premises or otherwise defaults in the performance of any obligations or covenants herein, Landlord may enforce the performance of this lease in any manner provided by law. This lease may be terminated at Landlord's discretion if such abandonment or default continues for a period of 10 days after Landlord notifies Tenant of such abandonment or default and of Landlord's intention to declare this lease terminated. . . . Thereafter, Landlord or its agents shall have the right, without further notice or demand, to enter the leased premises and remove all persons and property without being deemed guilty of trespass and without waiving any other remedies for arrears of rent or breach of covenant.

The landlord reads this provision to give him a superior right of possession in the items remaining on the premises because it is undisputed that the tenant received

the landlord's June 15 letter declaring that the lease was terminated and telling the tenant to recover his property.

The landlord's interpretation ignores that it was disputed whether the tenant had abandoned the property or premises in the first place. As discussed above, there was sufficient evidence to support the jury's finding that rather than abandoning the premises, the tenant was wrongfully excluded from it. Although the landlord is correct that he had the right to dispose of the property 60 days after storing it, he testified that he "liquidated" the inventory or let it perish "within 60 days." Furthermore, in his June 15 letter the landlord stated that he would only open the store and "allow" the tenant to take his inventory and "other assets" after he received a check from the tenant for $10,151.61. The amount of money the landlord demanded included charges for equipment, such as an ice cream freezer and cashier machine, which the tenant argued belonged to him, and also included disputed charges for rent. Based on this evidence, reasonable jurors could infer that the tenant had not "abandoned" the property or premises, but instead had been excluded from the premises and prevented from obtaining the property that was locked inside. Accordingly, sufficient evidence supported the jury's findings that the landlord had converted or stolen the tenant's personal property.

**B. Trade fixtures**

Even if the property was not abandoned, the landlord argues that several of the pieces of equipment—the gas tanks, walk-in cooler, and vapor recovery system—could not be subject to a conversion or theft claim as a matter of law because those items were not personal property, but were instead fixtures. When property is attached to realty and cannot be removed without materially damaging the property, it loses its character as personal property and becomes part of the realty. *Loredo v. State*, 130 S.W.3d 275, 282 n.3 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *Houston Bldg. Serv., Inc. v. Am. Gen. Fire & Cas. Co.*, 799 S.W.2d 308, 311 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Generally, whether property has become a fixture (which is part of the realty) rather than personal property is a fact question to be determined based on objective manifestations of intent in affixing the property to the realty. *Logan v. Mullis*, 686 S.W.2d 605, 608 (Tex. 1985); *Trenolone v. Cook Exploration Co.*, 166 S.W.3d 495, 499 (Tex. App.—Texarkana 2005, no pet.). But undisputed, objective evidence of intent to attach the property to realty will establish whether the property is realty or personalty as a matter of law. *Logan*, 686 S.W.2d at 608; *Houston Bldg. Serv.*, 799 S.W.2d at 311; *see also C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*, 295 S.W.3d 748, 755 (Tex. App.—Austin 2009, no

pet.); *Harris Cnty. Flood Control Dist. v. Roberts*, 252 S.W.3d 667, 670–71 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

A trade fixture is an item that the tenant annexes to realty to enable the tenant to carry on its business. *El Chico Rests.*, 295 S.W.3d at 755 (quoting *Reames v. Hawthorne-Seving, Inc.*, 949 S.W.2d 758, 761 (Tex. App.—Dallas 1997, pet. denied)). A tenant generally may remove and take away trade fixtures at the end of the lease, unless there is a contractual term to the contrary. *Alexander v. Cooper*, 843 S.W.2d 644, 646 (Tex. App.—Corpus Christi 1992, no writ); *Neely v. Jacobs*, 673 S.W.2d 705, 707–08 (Tex. App.—Fort Worth 1984, no writ). Here, the lease agreement provided that trade fixtures would not become the property of the landlord at the termination of the lease. A trade fixture does not lose its character as personalty because the intent of its annexation is to further the purposes of the tenant's trade, not to improve the realty. *See Sonnier v. Chisholm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995); *Neely*, 673 S.W.2d at 707–08. A trade fixture must be removable without permanent or material injury to the premises. *Sonnier*, 909 S.W.2d at 479; *El Chico Rests.*, 295 S.W.3d at 755.

The tenant presented some evidence that the underground gasoline tanks were removable, but the landlord presented undisputed evidence that he had installed the gasoline tanks with the intent to affix them to the premises, so they could not be the tenant's trade fixtures. The tenant's son testified that it was

29

"possible to dig up the underground tank[s]" and get them "in hand," although the removal would be expensive. But he never disputed that the landlord had installed the gasoline tanks. The landlord undisputedly installed the tanks and testified that he intended they become part of the realty when he did so. *See Sonnier*, 909 S.W.2d at 479 (the intention of the owner who causes the property to be annexed to the realty is "critical" in determining whether the property is a fixture). The objective manifestation of this intent was that he placed those tanks, which are 25 feet long and 15 feet wide, underground.

As for the other pieces of installed equipment, no evidence was presented that the walk-in cooler or vapor recovery system could be removed without damaging the premises or that the parties' intent was that it would be a removable trade fixture. In fact, the only evidence offered on the subject of removing the vapor recovery system suggested the opposite. The tenant's son testified that he "was not able to remove that system from that premises" himself. He also testified that he did not know what the system looks like, because it was buried underground when it was installed. When asked whether it was his intention to remove the system at the expiration of the lease, the tenant's son said "No, sir, I never thought about that." As for the walk-in cooler, the landlord testified that he installed it and the gasoline tanks as permanent parts of the premises that would return to him at the expiration of the lease. No evidence was offered that the walk-

30

in cooler could be removed without damaging the building; instead, the landlord testified that separating the walk-in cooler from the building would turn it into "scrap metal."

Accordingly, there insufficient evidence to support the jury's implied finding that the gasoline tanks, walk-in cooler, and vapor recovery system were items of personal property that could be subject to a conversion or theft claim. But, because the jury determined that the value of these items of equipment was also recoverable under the theory of unjust enrichment, we turn to consider whether the tenant could recover the value of these items under that theory of liability.

## C.    Unjust enrichment

Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied). A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). When a person has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon that person to restore the benefits to the plaintiff. *Burlington N. R.R. Co. v.*

31

*Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd sub nom.*, *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998). A plaintiff may also recover under this equitable doctrine if a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *French*, 169 S.W.3d at 11. This court has previously held that unjust enrichment is an independent cause of action. *See Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing on *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998)); *Cristobal v. Allen*, No. 01-09-00126-CV, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July 22, 2010, no pet.) (mem. op.).

Unjust enrichment is not a proper remedy, however, merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss or because the benefits to the person sought to be charged amount to a windfall. *Heldenfels Bros.*, 832 S.W.2d at 42. As a remedy based on quasi-contract principles, unjust enrichment is unavailable when a valid, express contract governing the subject matter of the dispute exists. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex. 2000); *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 723 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Based on the specific and somewhat unusual facts of this case, we conclude that unjust enrichment is an appropriate equitable remedy to compensate the tenant

32

for the value of the gasoline tanks, walk-in cooler, and vapor recovery system. The partes signed both a standard commercial lease agreement and also a separate contract for the purchase and sale of equipment associated with operating the gas station. According to these agreements, the landlord sold and the tenant purchased several pieces of equipment that the tenant would use in operating the gas station during the tenancy, including a cashier machine, two refrigerators, a coffee machine, the gasoline tanks, and the walk-in cooler. The jury found that the tenant paid the landlord $120,000 for that equipment, including the gasoline tanks, walk-in cooler, and vapor recovery system.

At the expiration of the lease, the landlord kept all of the equipment that he had sold to the tenant. The jury found that this action constituted conversion and theft of the tenant's property, but as explained above, conversion and theft do not apply to fixtures, which cannot be classified as personal property. The landlord wrongfully obtained a benefit by making use of the tenant's equipment when he resumed operation of the gas station. The tenant's other causes of action can provide no remedy for this benefit conferred upon the landlord. Considering that the parties entered into a sales contract specifically for the purpose of conveying valuable property from the landlord to the tenant, the jury could have and apparently did conclude that the parties never contemplated that such property would simply revert back to the landlord upon the expiration of the lease, and thus

it would be unconscionable to the landlord to retain the benefit of such property, and it must be required to make restitution to the tenant. Under these circumstances, unjust enrichment is an appropriate equitable remedy to compensate the tenant for the value of the equipment sold to him at the beginning of the lease.

The jury found that the landlord was unjustly enriched at the tenant's expense, and it determined damages based on the value of all of the equipment the landlord retained after the termination of the lease. The landlord nevertheless contends that the evidence is legally insufficient to support the trial court's award of damages for unjust enrichment because there was no evidence of the benefits the landlord received and because express contracts, the sales contract and lease agreement, cover the "central dispute" between the parties.

### 1. Benefits received by landlord

There was sufficient evidence of the benefits the landlord received by keeping the tenant's property. The landlord testified that he used the gasoline tanks, walk-in cooler, and vapor recovery system to operate the business. The tenant's son testified that the landlord's refusal to pay for the tanks was unreasonable because digging up the gasoline tanks and reinstalling them somewhere else would cost $120,000 to $130,000—more than their value. The

landlord does not contest that sufficient evidence supported the values the jury assessed for these materials.

### 2. No applicable express contract

Nor is the tenant's recovery for unjust enrichment barred by the existence of an express contract governing the parties' dispute. Generally, an unjust enrichment claim fails as a matter of law if an express contracts terms address recovery for the materials or services sought as part of the unjust enrichment claim. *See, e.g.*, *Fortune Prod.*, 52 S.W.3d at 684–85 (unjust enrichment claim for sale of part of gas stream barred by contracts with defendant specifying payments for gas); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 176 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (unjust enrichment claim for bonus exchanged for stock options barred by contract agreeing to exchange of bonus for stock options); *Burlington N. R.R.*, 925 S.W.2d at 98 (unjust enrichment claim for excessively high shipping rates barred by contract completely governing the issue of shipping rates). If the evidence does not show that a contract covers the services or materials at issue, then the factfinder may determine whether a party may recover under the equitable theory. *See Christus Health*, 359 S.W.3d at 724.

The tenant and the landlord never reached an agreement over the transfer of the tenant's property after the termination of the lease of the gas station. While the 1993 sales contract governed the question of who owned the equipment at the

35

beginning of the parties' relationship, that contract did not govern whether the landlord had to pay for that equipment or could force the tenant to uninstall it when the lease terminated and the landlord resumed occupancy of the premises. The landlord's retention and "liquidation" of the tenant's inventory, which the landlord did not dispute that the tenant owned, shows that the issue of ownership of the property does not govern their dispute over the method of transfer of that property.

Thus, viewing the evidence in a light that tends to support the judgment, we conclude that more than a scintilla of evidence supports the findings and damages awarded as unjust enrichment. As we hold that sufficient evidence supported the tenant's claim for unjust enrichment for the value of the installed pieces of equipment and sufficient evidence supported the damages award for the personal property retained by the landlord under conversion or theft, we affirm the judgment's award of damages based on the value of this property. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303–04 (Tex. 2006) (holding the prevailing party is entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict, but may only have one recovery for one injury even under multiple theories of liability); *Madison v. Williamson*, 241 S.W.3d 145, 159 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (holding trial court properly concluded plaintiff could recover for single injury when submitted identical damage question after each liability question in jury charge).

36

## V.     Attorney's fees

The landlord argues that we must remand for a new trial on attorney's fees because the trial court erred in awarded unsegregated attorney's fees. The issue of attorney's fees was submitted to jury in the charge, and the tenant's attorney offered his own testimony as evidence of attorney's fees. He testified that the tenant had incurred approximately $50,000 to $60,000 in attorney's fees and that he had not segregated his fees because the work he performed on the different causes of action was inextricably intertwined. The jury determined that reasonable amount of attorney's fees for the tenant's attorney was $35,000, plus $10,000 each in the event of appeals to the court of appeals and the Supreme Court of Texas.

The landlord has failed to preserve the fees challenge either through an objection to the testimony of the tenant's attorney or through an objection to the charge. *See* TEX. R. APP. P. 33.1; *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455–56 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (noting that a challenge to the failure to segregate attorney's fees must be preserved either through an objection to the charge or the testimony on unsegregated fees). Accordingly, we overrule the landlord's issue on the segregation of attorney's fees.

## VI.    Exemplary damages

In a cross-appeal, the tenant challenges the trial court's failure to award him exemplary damages in the judgment. The tenant requested a jury instruction on

exemplary damages and the jury assessed $450,000 in exemplary damages, but the instruction failed to reference the proper legal standard for the award of exemplary damages.  The trial court's judgment did not award exemplary damages.

"[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from fraud, malice, or gross negligence." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West Supp. 2012). Alternatively, the claimant may recover exemplary damages if a statute establishing a cause of action authorizes exemplary damages, but even in that case the claimant must prove by clear and convincing evidence that the damages resulted from the circumstances allowing their recovery as specified in the statute. *Id.* § 41.003(c).  The party seeking a particular remedy has the burden to prove the requirements of that form of relief and the obligation to request a question on that issue.  *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 598–99 (Tex. 2008) (holding that party seeking specific performance bore burden to prove necessary element to be entitled to specific performance).

At the jury charge conference, the following exchange took place regarding the exemplary damages question:

THE COURT:  Mr. Lee? This is the exemplary damages question.

38

COUNSEL FOR THE LANDLORD: That should be included somewhere suggesting that the clear and convincing evidence is not dismissed.

THE COURT: . . . [I]t's a little bit of an interesting question looking at [Civil Practice and Remedies Code section] 41.003(a) . . . requiring clear and convincing evidence that the harm resulted from fraud, malice or gross negligence, but it is not clear that for an intentional tort—an otherwise intentional tort, like conversion, which is really what we're talking about here . . . you have to show that by clear and convincing evidence.

It doesn't seem to indicate that in the pattern jury charge either. So I am going to overrule that, Mr. Lee. They do have to find—it does have to be unanimous and there's intent requirements in the—in both I think conversion and theft causes of action already. Well, actually, there's not in the way we have it worded.

Mr. Ahn, it's your question . . .

COUNSEL FOR THE TENANT: Yes, sir.

THE COURT: . . . your appeal to defend if it gets to that point. Do you want to put in language about clear and convincing?

COUNSEL FOR THE TENANT: I feel comfortable without it, Judge, because the PJC and the authorities we have seen does not require it[.]

As this colloquy reveals, the tenant did not request that the trial court to instruct the jury to determine whether damages were the result of fraud, malice, or gross negligence as proven by clear and convincing evidence.

When a party's theory of recovery or defense consists of multiple issues necessary to support that theory and the charge omits one of those necessary elements without objection, the parties are deemed to have waived jury

39

determination of the omitted elements. *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 340 (Tex. App.—Austin 2004, no pet.). Absent written findings on the omitted element, the trial court shall be presumed to have decided the omitted issue to support the judgment rendered. TEX. R. CIV. P. 279 ("If no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment."). Here, findings were not made on the omitted elements of whether the harm the tenant suffered was proven by clear and convincing evidence to be the result of fraud, malice, gross negligence, or a circumstance specified under a statutory theory of recovery. The trial court's judgment did not award exemplary damages, and we presume that the trial court decided the omitted issue in support of that judgment.

The tenant asserts that the landlord failed to preserve this issue on appeal, because he did make a proper objection to the tenant's proposed jury charge regarding exemplary damages. Alternatively, the tenant suggests that the trial court could not ignore the jury's finding on exemplary damages sua sponte. The tenant is incorrect on both counts. Again, it was the burden of the party seeking the remedy to request a proper instruction to obtain that remedy. *See DiGiuseppe*, 269 S.W.3d at 598–99. Furthermore, the landlord was not required to present a proper jury instruction to preserve error when he does not complain of error as to that aspect of the judgment. *See* TEX. R. CIV. P. 278 (requiring the party

40

complaining of the judgment to have submitted a proper question in writing to reverse the judgment). The trial court was free to ignore the jury's answer to the tenant's exemplary damages question because that answer was immaterial in light of an applicable statute. *See Oliver v. Oliver*, 889 S.W.2d 271, 273–74 (Tex. 1994) (holding that no proper objection to jury question is required when a statute renders the question immaterial); *Yeckel v. Abbott*, No. 03-04-00713-CV, 2009 WL 1563587, at *12 (Tex. App.—Austin June 4, 2009, pet. denied) ("in the absence of the findings chapter 41 requires before any such damages can be awarded," the jury's answer to an exemplary damages question is "simply immaterial"). A trial court may, on its own motion, disregard an immaterial jury finding. *Vann v. Brown*, 244 S.W.3d 612, 615 (Tex. App.—Dallas 2008, no pet.); *see also Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

Accordingly, we overrule the tenant's points of error on cross-appeal and affirm the trial court's judgment on the issue of exemplary damages.

## Conclusion

Having determined that the tenant cannot recover statutory damages when that issue was neither pleaded nor tried by consent, we reverse the judgment that the tenant recover treble damages for the amount of the security deposit, and we reduce the award of damages for failure to return the security deposit from $10,500 to $3,500. As reformed, we affirm that portion of the judgment. Based on the

41

reformed damages award, we vacate the award of prejudgment interest and remand to the trial court for a recalculation of interest.


Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale.