**AFFIRMED and Opinion Filed August 20, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00541-CV

**AAA COOPER TRANSPORTATION AND XTRA LEASE, LLC, Appellants**
**V.**
**OLYNTHUS M. DAVIS AND PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD, Appellees**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-10773**

## MEMORANDUM OPINION
Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Reichek

AAA Cooper Transportation and XTRA Lease, LLC appeal the trial court's judgment awarding Olynthus M. Davis damages for injuries he suffered while performing his job as a warehouseman. Bringing five issues, appellants generally contend (1) the trial court erred in submitting this case to the jury using a general negligence question, (2) the trial court abused its discretion in not excluding the testimony of Davis's experts, and (3) the evidence is insufficient to support the jury's answers to the charge questions regarding liability and future medical expenses. We affirm the trial court's judgment.

## Factual Background

Davis was a certified forklift driver employed as a warehouseman for Ozburn Hessey Logistics (OHL). On May 25, 2015, Davis was assigned to load pallets into a trailer that had been leased by AAA Cooper from XTRA. The trailer was equipped with an E-track system, which included a metal rail running horizontally down the length of the trailer wall. The rail had slots that provided tie-down points to strap cargo securely in the trailer. The rail was attached to the wall with rivets.

Before beginning the loading process, Davis inspected the trailer. Davis stated he was primarily looking for holes in the trailer's wall, ceilings, and floor. Davis did not inspect the E-track system and said he had never been trained to inspect the track or the rivets that affixed it to the wall. After performing the inspection, Davis signed an inspection report stating there was no damage to the sidewalls or floors.

Davis then began loading pallets into the trailer. After loading four or five pallets, Davis began loading a large pallet that was almost the size of the forklift. Because he could not see over the cargo, Davis shifted the load to the side so he could see forward while driving. Davis stated he looked down the side of the wall to make sure he was not touching it. As he was moving forward, Davis felt the forklift begin to strain and slow down. When it came to a stop, Davis threw his arm forward to prevent hitting his face and his arm struck the knob on the forklift steering wheel. Davis stated he immediately felt an aching and numbness sensation in his arm. When one of his fellow employees asked what had happened, he told her he had hurt his arm "really bad." She told him to back the forklift out. After moving the forklift back, his coworker exclaimed that Davis's leg had been torn open. The E-track rail had detached from the wall and impaled his leg. Davis looked down at his leg, saw "blood everywhere," and passed out.

Davis was taken by ambulance to the hospital where he stayed for approximately a week. Davis ultimately had multiple surgeries on both his leg and arm. Almost three years after the accident, he stated he was still in pain every day and could not fully bend his leg. He also suffered nerve damage to his arm that caused his fingers to curl into a claw position.

Immediately following the accident, AAA Cooper submitted an incident report. An initial report stated Davis had hit the wall of the trailer. The final version of the report stated Davis "hit the E-track on the side wall of the trailer and it broke off the wall stabbing [Davis] in the leg." Pictures taken of the inside of the trailer show a length of the E-track pulled off the wall and a bent portion of the rail lying on the floor.

Davis brought this suit against appellants alleging they had provided an unsafe trailer and were negligent in their failure to properly inspect, repair, and maintain the trailer. Prior to trial, Davis designated Peter Sullivan as an expert witness to testify regarding the condition of the trailer at the time of the accident and appellants' failure to properly inspect and maintain the E-track system. Appellants moved to exclude Sullivan's testimony arguing his opinions were not based on a reliable foundation and he was not qualified to opine on the specified matters. Appellants also moved to exclude the testimony of Dr. Jason Marchetti, Davis's expert witness on the issue of future medical expenses, by similarly challenging his qualifications and the basis of his testimony. Both motions were denied by the trial court.

At trial, Sullivan testified he inspected the trailer at issue in March 2017. Although the inspection occurred almost two years after the accident, Sullivan stated the trailer had travelled only 8,962 miles in that time, which amounted to only 5% of its service mileage. According to Sullivan, the portion of the E-track rail that had detached from the wall during Davis's accident was still missing when he inspected the trailer. His inspection showed that 38% of the rivets used to hold the remaining rail in place were either broken, loose, or missing and he testified that even

one missing rivet would compromise the system. He stated the rail was supposed to be held tightly in place by the rivets, but he could pull a portion of the rail away from the trailer wall with his fingers. He further stated the E-track rail only had to protrude 1/16 to 1/4 of an inch from the wall for a forklift or cargo to catch on it. Additionally, the weight of the forklift would cause the trailer to flex, and any portion of the E-track rail that was not properly secured could pop out.

In Sullivan's opinion, Davis's accident was caused by either the forklift or the cargo Davis was moving hitting the protruding end of the E-track rail. As the forklift moved forward, the rail pulled away from the trailer wall and pierced Davis's thigh. Sullivan further opined that the accident would not have occurred if the trailer had been properly inspected, maintained, and repaired. Sullivan acknowledged that Davis had performed an inspection of the trailer prior to the accident. But he stated Davis's inspection was conducted under a different standard of care than required of appellants and Davis would not be expected to examine the E-track system or the rivets holding it in place.

Appellants also hired an expert who examined the trailer two months after Sullivan. Although appellants' expert did not testify at trial, he created an expert report that was admitted into evidence. The report concluded that Davis's injuries were caused by the forklift impacting the wall of the trailer with sufficient force to pull the E-track rail off the wall. The report further concluded that, other than the missing portion of the E-track, the trailer showed no other damage and was in "excellent condition." Sullivan testified he did not believe the accident was caused by the E-track rail being forced off the wall following a collision with the forklift because such an occurrence was "nearly impossible" unless the E-track was improperly secured, and there was no evidence to indicate a collision of that force had occurred.

In addition to Sullivan, Davis presented the testimony of several AAA Cooper and XTRA employees responsible for the inspection and maintenance of the trailer. Vincent Daniels with

–4–

AAA Cooper testified he inspected the trailer before dropping it off at the warehouse to be loaded. Daniels testified he saw no damage to the trailer or anything coming off the walls. He conceded, however, that he did not specifically inspect the rivets holding the E-track in place.

Steven Porter, the director of equipment for XTRA, testified regarding the trailer's inspections and repair history. A company inspection report showed the trailer at issue was inspected in May approximately two weeks before the accident, and again three months later, in August 2015. During these inspections, XTRA's procedures required the employees to check the E-track system for damage. The report showed that no damage to the E-track was reported either before or after the accident despite the fact that a portion of the E-track rail was missing during the August inspection. Porter stated that a missing portion of the E-track would be considered damage that should be repaired. Porter further stated that missing or damaged rivets and the ability to pull the E-track away from the wall would also be considered damage requiring repair. The repair history for the trailer showed that the only maintenance performed on the unit before and after the accident was that it was swept out. Porter confirmed that no rivets on the E-track system were repaired or replaced.

Jacob Bass, director of sales and operations with AAA Cooper, stated that a missing portion of the E-track system is damage that should have been reported and replaced. Although Bass conceded that the E-track is not supposed to be loose, he stated he would not consider "some protrusion" of the E-track rail to be damage. Bass agreed that the trailer was not in "excellent condition" as reported by appellants' expert.

In support of Davis's claim for future medical expenses, Dr. Marchetti testified that he had examined Davis and reviewed his medical records to develop a "life care plan." The plan addressed Davis's future medical needs with respect to the injuries he suffered to his arm and his leg. According to Marchetti, all of the problems Davis was experiencing with his arm and leg

resulted from the trauma he sustained in the accident. Marchetti opined the present value of Davis's future medical expense needs was $223,275.69.

One of Davis's treating physicians, Dr. David Zehr, diagnosed Davis's arm and hand issues as resulting from a pinched ulnar nerve. He also originally diagnosed Davis as having a neuroma resulting from trauma to his arm. Dr. Zehr later changed his diagnosis, stating Davis had a neurofibroma in his arm and he did not find anything in his research to show that a neurofibroma would "come on after an injury."

Appellants filed proposed jury questions, instructions, and definitions. Included in appellants' proposed negligence definition was an instruction on premises defect liability. The charge submitted to the jury by the trial court gave only a general negligence definition. Based on that definition, the jury found all three parties negligent. The amount of negligence attributed to each party was: AAA Cooper – 40%, XTRA – 50%, and Davis – 10%. Davis was awarded damages for medical care expenses, physical impairment, physical pain, disfigurement, mental anguish, lost wages, and loss of earning capacity. The amount awarded for future medical expenses was the amount recommended by Sullivan.

Appellants filed a motion for judgment notwithstanding the verdict and a motion for new trial. Both motions were denied by the trial court following a hearing. This appeal followed.

## Analysis

### Negligence or Premises Liability

In their first issue, appellants contend the trial court erred in submitting the case to the jury using a general negligence question rather than a premises liability question. In reviewing alleged error in a jury charge submission, we consider the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). Whether the condition that allegedly caused the

plaintiff's injury is a premises defect is a legal question we review de novo. *Id*. It is well settled that, "a premises defect case improperly submitted to the jury under only a general-negligence question, without the elements of premises liability as instructions or definitions, causes the rendition of an improper judgment." *Id*. at 469–70.

In this case, the crux of the issue is whether the trailer in which Davis was injured was a "premises" over which appellants had control, or was merely appellants' personal property. In making the argument that the trailer must be considered a premises, appellants contend that, once the trailer was parked next to the warehouse and the wheels were chocked to prevent the trailer from moving, the trailer "became an extension, and thus a part, of the warehouse premises." We disagree.

In determining if premises liability attaches to claims involving movable property, courts mainly focus on whether the property was affixed or connected to the real property. *See City of Houston v. Harris*, 192 S.W.3d 167, 173 (Tex. App.—Houston [14th Dist.] 2006, no pet.). "When property is attached to realty and cannot be removed without materially damaging the property, it loses its character as personal property and becomes part of the realty." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 110 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Whether personal property has become a part of the realty is generally a fact question determined based on objective manifestations of intent to affix the property to the realty. *Id*. However, undisputed, objective evidence regarding intent may establish whether the property is part of the realty or remains personal property as a matter of law. *Id*.

There is no evidence in this case of any objective manifestations of intent for the trailer to become affixed to the warehouse in a manner that would render it part of the business premises. The trailer was simply backed up to the edge of the warehouse door to allow for easier loading. The wheels were rendered immovable for safety purposes, not to affix it or make it an addition to

the warehouse realty. This is demonstrated by the fact that, once loading was complete, it was intended that the trailer be removed.

Appellants rely heavily on *United Scaffolding, Inc. v. Levine* for the proposition that the trailer should qualify as an extension of the premises. In *Levine*, the court addressed whether a contractor had sufficient control over scaffolding attached to the side of a business premises to be liable under a theory of premises liability. *Levine*, 537 S.W.3d at 474. In that case, however, the court never addressed whether the scaffolding was properly considered a part of the premises because that issue was not presented by the parties. *Id*. at 486 (Boyd, J. dissenting). The court only discussed the issue of control. Accordingly, the analysis in *Levine* is inapposite.

Appellants also rely heavily on the case of *Gibbs v. ShuttleKing, Inc.*, 162 S.W.3d 603 (Tex. App.—El Paso 2005, pet. denied). In *Gibbs*, a bus driver sued his employer for failure to provide a reasonably safe workplace after he was wounded during a robbery of the charter bus he was driving. *Id*. at 606–07. The court concluded the bus was "sufficiently similar to a premises" to fall under the purview of premises liability law as that law relates to the duty to protect against third party criminal conduct. *Id*. at 613. Significant to the court's analysis was the fact that the bus was the plaintiff's "workplace." *Id*. at 613.

Although appellants do not characterize it this way, *Gibbs* does not concern the circumstances under which mobile property may be considered a part of a fixed premises. Instead it concerns whether mobile property can be considered a premises in and of itself because it is functioning as such. For example, in *Hausman Packing Co. v. Badwey*, the court concluded that premises liability law applied to the interior of a truck out of which the defendants were operating a butcher shop. 147 S.W.2d 856, 858 (Tex. App.—San Antonio 1941, writ ref'd). The defendants displayed their goods in the trailer portion of the truck and customers would enter the trailer to make their purchases. *Id*. The fact that the truck could be moved did not change the fact that the

manner in which the defendants were using the vehicle made it "in every respect similar to a house." *Id.* Similarly, in *Key v. Expressjet Airlines, Inc.*, the court concluded the interior of an airplane could be considered a "moveable business premises" because, like businesses located on real property, customers were invited in and business was conducted within the cabin. No. SA-16-CV-00510-OLG, 2017 WL 10775020, at *6 (W.D. Tex. Dec. 12, 2017).

There is no evidence in this case to suggest the trailer at issue was being used as a "moveable business premises." Customers were not invited into the trailer for the purpose of conducting business. And, although workers moved in and out of the trailer to load it, it was not, in and of itself a workplace nor, as discussed earlier, an extension of the warehouse. Instead, the record shows the trailer was used solely as a tool to transport pallets of goods from one location to another. As such, the trailer was no more a "business premises" than the forklift Davis used to move the pallets from the warehouse to the trailer. A cause of action for failure to maintain a tool used by a plaintiff in the course of his work is a claim sounding in negligence. *Cf. Simmons v. Briggs Equip. Trust*, 221 S.W.3d 109, 113 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (negligence suit brought by employee injured when fire started in mobile rail-car mover he was operating). The fact that the tool happens to be large enough for the plaintiff to enter inside of it does not, by itself, change the nature of the claim. *Id.*

During oral argument, appellants cited this Court to two cases they say stand for the proposition that the trailer should be considered a premises; *Maldonado v. Sw. Motor Transport, Inc.*, No. 04-10-00235-CV, 2011 WL 649170 (Tex. App.—San Antonio Feb. 23, 2011, no pet.) and *Fontenot v. FedEx Ground Package Sys., Inc.*, 146 Fed. Appx. 731 (5th Cir. 2005). In *Maldonado*, the plaintiff sued the owner of a warehouse for injuries he sustained when a box on which he was standing collapsed and he fell to the floor of a trailer parked in the warehouse loading area. *Maldonado*, 2011 Wl 649170, at *1. The court did not hold that the trailer was a premises

or an extension of the warehouse. Instead, the only issue was whether the warehouse owner had actual or constructive knowledge that the boxes loaded inside the trailer parked on the warehouse premises created an unsafe condition. *Id*. at *2. Personal property that creates an unsafe condition on real property may give rise to a premises liability claim against the party that owns or controls the real property. *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 388 (Tex. 2016). Here, it is undisputed that neither appellant owned or controlled the real property on which the trailer was parked.

In *Fontenot*, an independent contractor driving his own truck was injured when FedEx employees placed heavy boxes on a high shelf in his truck's cargo area and then refused to help him move the boxes to the floor. *Fontenot*, 146 Fed. Appx. at 733. The driver sued FedEx for negligence and appealed the district court's determination that he was asserting a premises liability cause of action. *Id*. The fifth circuit reversed the district court's judgment holding the plaintiff's claim did *not* sound in premises liability because the plaintiff was the owner of the "purported premises." *Id*. Since the case was decided on that basis, the opinion did not address the issue presented here, which is whether the truck could be considered a premises at all.[1]

Based on the foregoing, we conclude the trailer was neither a premises nor an extension of the warehouse premises, but was instead appellants' personal property. Accordingly, the trial court did not err in refusing to include premises liability instructions in the jury charge. We resolve appellants' first issue against them.

---

[1] The opinion contains a hypothetical in which the court stated the truck owner "presumably could be liable to a FedEx employee who, when loading, slipped on a slick oily area on the back floor of the truck which [the truck owner] had negligently allowed to remain there." The court does not state, however, what theory of liability would apply to the truck owner, i.e. negligence or premises liability. Furthermore, the hypothetical scenario presented by the court is dicta.

**Expert Testimony and Sufficiency of the Evidence**

**I. Liability Expert**

In appellants' second and third issues, argued together, they contend the trial court erred in refusing to exclude the testimony of Davis's liability expert and the evidence is both legally and factually insufficient to support the jury's answers to the liability questions in the court's charge. The trial court is the "evidentiary gatekeeper" responsible for excluding irrelevant and unreliable expert evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). The court has broad discretion to determine the admissibility of evidence, and we will reverse only for an abuse of that discretion. *Id.* A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Nabors Well Servs., Ltd v. Romero*, 508 S.W.3d 512, 529 (Tex. App.— El Paso 2016, pet. denied).

To be admissible, expert testimony must meet three predicates: the witness must be qualified; the opinion must be relevant; and the opinion must be based on a reliable foundation. *Romero*, 508 S.W.3d at 529. On appeal, appellants do not challenge either Sullivan's qualifications or the relevance of his opinions. They challenge only the reliability of the foundation on which his opinions were based. Expert testimony is unreliable if it is based on unreliable data or if the expert draws conclusions from the underlying data based on a flawed methodology. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007). Testimony may also be unreliable if there is "too great an analytical gap between the data the expert relies on and the opinion offered." *Zwahr*, 88 S.W.3d at 629. Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015). In determining admissibility, the trial court does not decide whether the expert's conclusions are correct, but only whether the

analysis used to reach those conclusions is reliable. *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998).

In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 115 (Tex.2009); *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). A legal sufficiency challenge "will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere suspicion or surmise that the fact exists. *Thompson & Knight LLP v. Patriot Expl., LLC*, 444 S.W.3d 157, 162 (Tex. App.—Dallas 2014, no pet.). An expert's opinion that is speculative or conclusory or assumes facts contrary to evidence in the record is legally insufficient to support a verdict. *Id*.

To evaluate a factual sufficiency challenge, we must consider and weigh all the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We can set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. We must not substitute our judgment for that of the jury and should remain cognizant that the jury is the sole judge of witness credibility. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Sullivan's opinion in this case was that appellants failed to properly inspect, maintain, and repair the E-track system in the trailer and this failure was the proximate cause of Davis's injuries. The focus of appellants' challenge to Sullivan's opinion is the length of time between the accident

and his inspection of the trailer. Appellants argue Sullivan could only speculate regarding the condition of the E-track at the time Davis was injured and, therefore, his opinion is not founded on reliable data.

Sullivan's opinion was based on, among other things: (1) his 39 years of experience and training in vehicle mechanical systems for commercial motor vehicles including maintenance and safety, cargo loading and unloading, cargo securement, and accident investigation and reconstruction; (2) the accident report created by AAA Cooper; (3) online mechanical specifications for the E-track system and its installation; (4) pictures of the interior of the trailer taken immediately after the accident; and (5) his inspection of the trailer in 2017. Sullivan stated that the condition of the trailer at the time of his inspection was substantially the same as when Davis was injured based on the "little additional mileage" that had accumulated on the trailer since the accident, the clear absence of any repair or maintenance to the E-track system since the accident, and photos of the interior of the trailer taken in 2015 and 2017 showing it was in nearly identical condition. Sullivan stated that the deteriorated state of the E-track would not have occurred as a result of the low usage of the trailer in the two years following the accident and, from his experience, the condition of the trailer demonstrated that maintenance had been neglected for well over two years. According to Sullivan, the rivets remaining in the E-track in 2017 appeared of uniform age and there was no evidence any new rivets had been installed to replace those that had been damaged. XTRA's director of equipment confirmed that no rivets on the E-track system had been repaired or replaced.

The lapse of time between an accident and an inspection is the type of challenge that goes to the weight of the evidence rather than its admissibility. *Nabors*, 508 S.W.3d at 536. Sullivan addressed at length the factual basis for his determination that the condition of the trailer had not changed substantially in the time between the accident and his inspection. The information used

by Sullivan to form his opinion, including photographs of the trailer taken immediately after the accident, is the type of data that is sufficient to support such a conclusion. *See Ceniceros v. Pletcher*, No. 07-15-00427-CV, 2017 WL 2829325, at *4 (Tex. App.—Amarillo June 29, 2017, pet. denied). Although appellants point to factors such as the truck's continued use and the quality of the photographs Sullivan used, these are appropriate topics for cross-examination and do not render the evidence inadmissible. *Nabors*, 508 S.W.3d at 536.

It is undisputed that Davis was injured when a portion of the E-track detached from the wall and impaled his leg. The only dispute concerned the cause of the detachment. Appellants' expert contended the rail detached as a result of Davis slamming the forklift into the trailer wall with sufficient force to dislodge the E-track. Sullivan discounted this theory, stating the trailer wall showed no evidence of an impact of this magnitude either in 2015 or 2017. Appellants attempt to discredit this testimony by pointing out that Sullivan stated Davis impacted the E-track with the forklift. Appellants mischaracterize Sullivan's statement. His testimony was that the forklift hit "the protruding end of the E-track." This statement is not inconsistent with Sullivan's opinion that the forklift did not significantly impact the trailer wall.

Sullivan stated it would have been "nearly impossible" for the accident to have occurred if the portion of E-track that impaled Davis had been properly secured to the wall. Appellants point to photographs purportedly showing "rivets, or remnants of rivets, in every single place they should have been for the section of E-track that was ripped off the trailer wall" to argue that Sullivan's opinion is unfounded. Contrary to appellants' assertion, however, Sullivan opined that the E-track had to protrude from the wall only a fraction of an inch for the accident to occur; not that rivets had to be entirely absent. Sullivan stated many of the rivets in the trailer were either loose or damaged and not holding the E-track firmly against the wall.

–14–

Appellants also point to inspection reports created by XTRA, AAA Cooper, and Davis shortly before the accident in which no damage to the inside of the trailer was noted. Appellants rely on these reports for the proposition that the trailer was undamaged both at the time XTRA rented the trailer to AAA Cooper, and again when the trailer was being loaded by Davis. The validity and reliability of these inspection reports, at least with respect to the condition of the E-track, was brought into doubt by the testimony of the employees who either conducted the inspections or were in charge of the equipment. The jury was free to consider this conflicting evidence and we may not substitute our judgment for theirs. *See Jackson*, 116 S.W.3d at 761.

Davis testified that, although he inspected the inside of the truck before he began loading, he did not specifically inspect the E-track rail and he had no training with respect to the E-track system. The AAA Cooper employee that inspected the truck before Davis also stated that he looked at the walls of the trailer for obvious damage, but did not inspect the rivets attaching the E-track to the walls. Although the inspection reports created by XTRA stated the trailer had no damage, these reports continued to state the trailer had no damage after Davis's accident when a section of the E-track rail was missing from the wall. Although the E-track was never repaired, the XTRA inspection reports put into evidence show the trailer was consistently reported as having "no damage" up until shortly before it was inspected by Sullivan. XTRA's director of equipment conceded that the problems found by Sullivan in his inspection, including the missing portion of the E-track and another portion that could be easily pulled from the wall, should have been reported as damage on the inspection reports.

Finally, appellants argue there is no evidence XTRA knew or should have known of any defects in the rivets in the E-track because "Sullivan never expressly mentioned XTRA Lease" in his opinions. The record does not support this argument. In Sullivan's report, which was admitted into evidence, he opined that, based on the materials he reviewed and his inspection of the trailer,

the E-track system "was likely in need of repair prior to the time of the subject injury incident and was improperly or inadequately secured to the cargo walls of the subject semi-trailer." Sullivan further opined that the poor condition of the E-track "likely should have been readily identifiable, documented, and corrected by Defendant XTRA Lease LLC prior to renting the subject semi-trailer to Defendant AAA Cooper Transportation."

Based on the foregoing, we conclude the trial court did not abuse its discretion in admitting Sullivan's expert testimony and the evidence is both legally and factually sufficient to support the jury's findings as to liability. We resolve appellants' second and third issues against them.

## II. Future Medical Expenses Expert

In their fourth and fifth issues, again argued together, appellants contend the trial court erred in admitting the testimony of Davis's expert on future medical expenses and the evidence was factually insufficient to support the jury's award of these expenses. Appellants state they are not challenging all of the expenses awarded, but are "target[ing]" only "the medical expenses assigned to future medical treatment of the neurofibroma in Davis's right elbow." Appellants specifically challenge Dr. Marchetti's qualifications to opine on the issue of whether Davis's arm issues were caused by a traumatically induced neuroma or a pre-existing neurofibroma unrelated to the accident.

The proponent of expert testimony has the burden to show that the expert possesses special knowledge as to the specific matter on which he proposes to give an opinion. *Broders v. Heise*, 924 S.W.2d 148, 152–53 (Tex. 1996). The rules of evidence require that the expert be qualified "by knowledge, skill, experience, training, or education," and that their testimony "assist the trier of fact." TEX. R. EVID. 702. The proper inquiry concerning whether a doctor is qualified to testify is not his area of practice, but his familiarity with the issues involved in the claim before the court. *Foster v. Richardson*, 303 S.W.3d 833, 843 (Tex. App.—Fort Worth 2009, no pet.).

Appellants argue that Dr. Marchetti is "not an orthopedic doctor" and, therefore, not qualified to contest the opinion of Dr. Zehr, Davis's treating orthopedic surgeon, as to the cause of Davis's arm issues. Dr. Zehr originally attributed Davis's arm injury to a traumatically induced neuroma caused by the accident, but then changed his opinion to say he was suffering from a pre-existing neurofibroma that was not caused by the trauma to his arm. Dr. Marchetti disagreed, stating it was unlikely Davis had neurofibromatosis and, even if he did, it was aggravated and became symptomatic due to the trauma caused by the accident.

Although Dr. Marchetti's specialty was physical medicine and rehabilitation rather than orthopedic surgery, the record shows he was a member of the American Association of Orthopedic Medicine and had experience dealing with neuromas. In addition, Dr. Marchetti served as an advisor for the Texas Neurofibromatosis Foundation and the Department of Defense's program for neurofibromatosis research funding. He also had a child with neurofibromatosis and was "very familiar with the variable presentation of neurofibromatosis as well as the unique medical concerns that can occur." Finally, Dr. Marchetti was certified as a designated doctor for Texas Workers' Compensation which involved determining whether the mechanism of a work-related injury was sufficient to cause the employee's pathology. We conclude this is sufficient to show that Dr. Marchetti had specialized knowledge, skill, experience, training, or education that would assist the trier of fact on the subject of the claimed injury to Davis's arm. The trial court did not abuse its discretion in admitting his testimony. *See id.* at 845.

Dr. Marchetti testified at length regarding Davis's injury to his arm. He stated he had reviewed all of Davis's medical records and independently examined him. He stated it was doubtful that Davis had neurofibromatosis given his prior medical history and the initial pathology report stating he had a post-traumatic neuroma. But, even if he had neurofibromatosis, Dr. Marchetti stated it was clear the trauma of the injury caused any pre-existing neurofibromas to

accelerate and worsen. Dr. Marchetti noted that Davis was entirely asymptomatic before the accident and, afterwards, had significant pain and numbness. He said "I know with neurofibromas, that if you traumatize them they can go from being tiny and doing nothing, to swelling and causing nerve damage."

The testimony of Dr. Zehr that appellants rely upon does not, in fact, conflict with Dr. Marchetti's assessment. After stating that he believed Davis had a neurofibroma, Dr. Zehr was asked, "So what does that mean as it relates to his injury? Do you have an opinion as to that?" Dr. Zehr responded, "I do not. I don't know, I don't know. Even in my research I did not find anything that says neurofibromas come on after an injury. Neuromas, yes, neurofibromas, no." Dr. Marchetti agreed with Dr. Zehr that neurofibromas do not "come on after an injury." But he stated the trauma could have caused the aggravation of a pre-existing neurofibroma resulting in the Davis's current medical issues. We conclude the evidence is factually sufficient to support the jury's award of future medical expenses for Davis's arm injury. We resolve appellants' fourth and fifth issues against them.

We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

180541F.P05

–18–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

AAA COOPER TRANSPORTATION
AND XTRA LEASE, LLC, Appellants

No. 05-18-00541-CV       V.

OLYNTHUS M. DAVIS AND
PROPERTY & CASUALTY INSURANCE
COMPANY OF HARTFORD, Appellees

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-10773.
Opinion delivered by Justice Reichek.
Justices Schenck and Osborne participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees OLYNTHUS M. DAVIS AND PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD recover their costs of this appeal and the full amount of the trial court's judgment from appellants AAA COOPER TRANSPORTATION AND XTRA LEASE, LLC and from RLI Insurance Company as surety on appellants' supersedeas bond.

Judgment entered August 20, 2019